# In the United States Court of Federal Claims

No. 19-663C

(Filed: May 16, 2023)

|  |  |
|---|---|
| **JOEL V. KELTNER,** | ) |
| | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Elizabeth E. Olien*, Orrick, Herrington & Sutcliffe LLP, Washington, D.C., for Plaintiff. With her on the briefs were *Caitlin Kasmar* and *Graham Gardner*. Of counsel were *Esther Leibfarth*, *Rochelle Bobroff*, and *David Sonenshine*, National Veterans Legal Services Program, Washington, D.C.

*Joshua W. Moore*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director. Of counsel was Major *Scott W. Medlyn*, Civil Law and Litigation Domain, Military Personnel Litigation Branch, United States Air Force.

## OPINION AND ORDER

*SOLOMSON*, **Judge.**

The Department of Defense ("DoD") and its component agencies — including the Department of the Air Force[1] — manage the Disability Evaluation System ("DES"). Rooted in Chapter 61 of Title 10 of the United States Code, the DES prescribes the standards and processes the military uses to determine whether a service member is fit

---

[1] *See* 10 U.S.C. § 9011 ("The Department of the Air Force is separately organized under the Secretary of the Air Force. It operates under the authority, direction, and control of the Secretary of Defense.").

for duty or should be retired or separated due to a disability.  *See* 10 U.S.C. §§ 1201–22;[2] *see also Torres v. Del Toro*, 2022 WL 5167371, at *1 (D.D.C. Oct. 5, 2022) ("When a military servicemember is set to be discharged from service due to medical disability, Chapter 61 of Title 10 of the U.S. Code provides the general guidelines for the process that the servicemember is due.").

Plaintiff, Joel V. Keltner, seeks disability retirement pay and benefits resulting from post-traumatic stress disorder ("PTSD") incurred in the line of duty.  Mr. Keltner alleges that the United States — acting by and through the Air Force — has unlawfully denied him such pay and benefits under the DES.  The parties filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons set forth below, Mr. Keltner prevails.  The Air Force Board for Correction of Military Records ("AFBCMR" or the "Board") has the authority to correct Mr. Keltner's record to remedy the Air Force's failure to follow statutory and regulatory procedures in handling his disability.  That means, as the government argues, the Board generally has the power to correct a service member's records not only to retroactively add and remove a service member from the Temporary Disability Retired List ("TDRL"), but also to determine his or her disability rating.  Based on the administrative record, however, the Board's determination — that Mr. Keltner is entitled only to a ten percent disability rating as of August 31, 2016 — is arbitrary, capricious, or otherwise contrary to law.  Whether this Court should remand this matter, yet again, or enter judgment for Mr. Keltner is an issue that requires further input from the parties.

# I.      STATUTORY AND REGULATORY BACKGROUND

The Court begins with a summary of the DES.  Shakespeare was undoubtedly correct that "brevity is the soul of wit,"[3] and although we will attempt to be as brief as possible, there is nothing amusing about this system's complexity.  Indeed, describing the DES as byzantine is an understatement that may be unkind even to that ancient empire.

## A.  DES Overview

The DES is not described in one central document, but rather its "details . . . are

---

[2] The current version of these statutory provisions stems from the Career Compensation Act of 1949, Pub. L. No. 81-351, 63 Stat. 802, 802–41 (1949).  Title IV of that statute contained "Provisions Relating to Retirement, Retirement Pay, Separation and Severance Pay for Physical Disability" and created the original version of the Temporary Disability Retired List at issue in this case.  *See id.* § 401, 63 Stat. at 816 ("Establishment of a temporary disability retired list.").

[3] William Shakespeare, Hamlet act 2, sc. 2, *l.* 97.

defined through rules generated by the Secretary of Defense and secretaries of the military services pursuant to Congressional authorization." *Torres*, 2022 WL 5167371, at *1 (citing 10 U.S.C. §§ 1216, 1222(c)); *see also Sabo v. United States*, 127 Fed. Cl. 606, 610 (2016) ("A service member's fitness for duty and eligibility for separation or retirement is governed by regulations promulgated by the Secretary of the military department to which the service member belongs."). DoD implements the DES via various directives,[4] instructions,[5] and manuals.[6] *Torres*, 2022 WL 5167371, at *1.[7] The Air Force, in turn, has issued Air Force Instruction ("AFI") 36-3212, which "prescribes guidance on retiring, discharging, or retaining service members who, because of a physical disability, are unfit to perform the duties required of them" and "provides for the required periodic physical

---

[4] *See DoD Directive 1332.18*, at 1 (Nov. 4, 1996) [hereinafter DoDD 1332.18], https://apps.dtic.mil /sti/pdfs/ADA320998.pdf (reissuing "[DoDD 1332.18], dated February 25, 1986, to update policy and responsibilities for separation or retirement for physical disability under Title 10" and "authorize[] procedures under DoD Instructions 1332.38 and 1332.39 for the DoD [DES]"). This directive explains that the "DES shall be the mechanism for implementing retirement or separation because of physical disability in accordance with Chapter 61 of 10 U.S.C." *Id.* at ¶ C.1.

[5] *See* ECF No. 68-1 ("Def. MJAR App'x") at 259, 264 (attaching *DoD Instruction 1332.18: Disability Evaluation System* 1, 6 (Aug. 5, 2014) (cancelling DoDD 1332.18 and reissuing it as a DoD Instruction ("DoDI") "in accordance with the authority in DoDD 5124.02")). The latest version of DoDI 1332.18 is *DoD Instruction 1332.18: Disability Evaluation System* (Nov. 10, 2022) [hereinafter DoDI 1332.18], https://www.esd.whs.mil/Directives/issuances/dodi/. The latest version notes that it "[r]eissues and [c]ancels . . . [DoDI] 1332.18, 'Disability Evaluation System (DES),' August 5, 2014, as amended." This opinion cites to the current version of the relevant publications, unless noted otherwise.

[6] *See DoD Manual 1332.18, Vol. 1, Disability Evaluation System Manual: Processes* (Feb. 24, 2023) [hereinafter DoDM 1332.18]. DoD Manuals are available here: https://www.esd.whs.mil /Directives/issuances/dodm/.

[7] *See also* Wash. Headquarters Servs., *DoD Directives Division*, https://www.esd.whs.mil/DD/ (last visited May 2, 2023) ("The DoD Issuances Program processes the documents that establish and implement DoD policy, called 'DoD issuances.' Issuance types include Instructions (DoDI), Directives (DoDD), Manuals (DoDM), Directive-Type Memorandums (DTM) & Administrative Instructions (AI)."); *Department of Defense and Military Policies, Regulations, and Forms* (Sept. 23, 2021), https://www.defense.gov/Contact/Help-Center/Article/Article/2762957/department-of-defense-and-military-policies-regulations-and-forms/ ("DOD issuances contain the various policies and procedures [that] govern and regulate activities and missions across the defense enterprise. They take the form of formal directives, instructions, publications and manuals, administrative instructions, and directive-type memorandums. . . . Each Military Department publishes forms and regulations that similarly govern and regulate the activities within its respective military branch[.]"); *Golding v. United States*, 48 Fed. Cl. 697, 737 (2001) ("[T]here is no requirement that the military regulation or procedure be published in the Federal Register in order to warrant compliance[.]"), *aff'd*, 47 F. App'x 939 (Fed. Cir. 2002).

examinations and final disposition of members on the [TDRL]."[8]

Service members with putative disabilities proceed through one of two processes: the Legacy Disability Evaluation System ("LDES") or the Integrated Disability Evaluation System ("IDES"). DoDI 1332.18, § 1.2.b. If a service member is processed through the LDES, the DoD alone determines whether ill or injured service members are fit for continued military service and entitled to disability benefits.[9] The IDES, by contrast, is integrated in that it is jointly implemented by both the DoD and the United States Department of Veterans Affairs ("VA"). In particular, the IDES is "[t]he joint DoD/VA process by which DoD determines whether ill or injured Service members are fit for continued military service, and the DoD *and VA* determine appropriate benefits for Service members who are separated or retired for disability." *Id.* § G.2 ("Definitions") (emphasis added).[10] The default path is "through the IDES unless the Secretary of the Military Department concerned" makes certain determinations. *Id.* § 1.2.c; *see also* AFI 36-3212, ¶ 1.1.2.1 ("The LDES process is an exception to the IDES policy."). This case implicates the IDES only.

In general, the DES process is comprised of: (1) a medical evaluation, including a medical evaluation board ("MEB") review, impartial medical reviews, and an opportunity for the service member to provide a rebuttal; and (2) a disability evaluation,

---

[8] *Air Force Instruction 36-3212: Physical Evaluation for Retention, Retirement, and Separation* 1 (July 15, 2019) [hereinafter AFI 36-3212], https://static.e-publishing.af.mil/production/1/af_a1 /publication/afi36-3212/afi36-3212.pdf; *see also* Off. of the Under Sec'y of Def. (Pers. & Readiness), *Report to Congress − The Temporary Disability Retired List (TDRL): An Assessment of its Continuing Utility and Future Role*, 7 n.7 (2008) [hereinafter *OUSD(P&R) Report to Congress*], https://prhome.defense.gov/Portals/52/Documents/WCP%20Documents /Sec_1647_report.pdf (noting that "[t]he Army regulations governing the disability retirement system are contained in Army Regulation 635-40; [t]he Air Force regulations governing the TDRL and disability retirement are [AFI] 36-3212; and the Navy appear in SECNAV Instruction 1850.4E").

[9] *See* DoDI 1332.18, § G.2 (explaining that the LDES is "[a] DES process by which DoD determines whether eligible wounded, ill, or injured Service members are fit for continued military service *and* determines appropriate benefits for Service members who are separated or retired for disability" (emphasis added)).

[10] "The IDES, enacted by law in 2007, established a partnership between [DoD] and [VA] to ensure timely case processing and seamless transition of service members approved for disability separation or retirement." AFI 36-3212, ¶ 1.1.2; *see also* DoDM 1332.18, § 3.1.b (2023) ("The IDES comprises all disability examinations and all administrative activities associated with IDES case management from the point of referral by a military medical care provider to the point of return to duty or completion of both DoD and VA benefits decision determinations, including the management of Service members who are temporarily retired for disability through the IDES."). For a diagram of the IDES process, see DoDM 1332.18, § 3.2 (Figure 1). For a diagram of the Air Force's DES process, see AFI 36-3212, § 1.1 (Figure 1.1).

including a physical evaluation board ("PEB") review, counseling, case management, adjudication, and a final disposition.  DoDI 1332.18, § 3.1.

The MEB "[r]eview[s] all available medical evidence, including examinations completed as part of DES processing, and document[s] *whether* the Service member has medical conditions that either singularly, collectively, or through combined effect, *may* prevent them from reasonably performing the duties of their office, grade, rank, or rating."  DoDI 1332.18, § 3.2.a(1) (emphasis added).  If the MEB determines that a service member has such condition(s), "the MEB will refer the case to the PEB."  *Id.* § 3.2.d.[11]

### B.  PEBs

The purpose of the PEB is to "*determine the fitness* of Service members with medical conditions that are, either singularly, collectively, or through combined effect, potentially unfitting and, for members determined unfit, *determine their eligibility for compensation*."  DoDI 1332.18, § 3.3.a (emphasis added) (citing 10 U.S.C. Ch. 61).  There are two types of PEBs: the informal physical evaluation board ("IPEB") and the formal physical evaluation board ("FPEB").  The IPEB first reviews the service member's "case file to make initial findings and recommendations without the Service member present."  *Id.* § 3.3.b(1).  The service member may accept the IPEB's findings, rebut them, "request a [FPEB] if found fit, or, if found unfit, demand a FPEB in accordance with [10 U.S.C. § 1214]."  *Id.*  In that regard, 10 U.S.C. § 1214 provides that "[n]o member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."[12]

As part of the FPEB proceedings, a service member is "entitled to address issues pertaining to their fitness, the percentage of disability, degree or stability of disability, administrative determinations, a determination that their injury or disease was non-duty related, or that their injury or disease was combat-related or took place in a combat-zone."  DoDI 1332.18, § 3.3.c(4).  The FPEB process also includes several procedural requirements and protections for service members, such as the right: (1) to "[b]e represented by government-appointed counsel provided by the Military Department concerned"; (2) "to remain silent"; and (3) to "[r]equest witnesses and introduce depositions, documents, or

---

[11] The service member may request "an impartial physician or other appropriate health care professional who is independent of the MEB" to review the MEB's "findings and recommendations," as well as to "[a]dvise and counsel the Service member regarding" those findings.  DoDI 1332.18, § 3.2.e(4).  Service members are given an opportunity to submit "at least one rebuttal of the MEB findings."  *Id.* § 3.2.e(6).

[12] *See also* DoDI 1332.18, § 3.3.c(1)(a) ("In accordance with Section 1214 of Title 10, U.S.C., Service members are entitled to a full and fair hearing, upon request, before the Service member may be separated or retired for physical disability.").  The service member is also entitled to an FPEB to contest a military Secretary's unilateral change to the IPEB's fitness determination if the service member concurred with the original IPEB determination.  *Id.* § 3.3.c(1)(b).

other evidence, and to question all witnesses who testify at the hearing." *Id.* § 3.3.c(5).[13] PEBs "must convey" their "findings and rationale in an orderly and itemized fashion, with specific attention to each issue presented by the Service member regarding their case." DoDI 1332.18, § 3.3.f ("Record of Proceedings").

In general, a service member is unfit for duty where: (1) "[t]he evidence establishes that the member, due to disability, is unable to reasonably perform the duties of their office, grade, rank, or rating"; or (2) the evidence establishes that the disability either (a) "[r]epresents a decided medical risk to their health or to the welfare or safety of other members," or (b) "[i]mposes unreasonable requirements on the military to maintain or protect the Service member." DoDI 1332.18, § 6.2 ("General Criteria for Making Unfitness Determinations"). In assessing fitness for duty, the PEB "will consider all relevant evidence." *Id.* § 6.3.

### C. Disability Compensation: Separation or Retirement

If a service member is found to be unfit, "a determination will be made as to the Service member's entitlement to separation or retirement for disability with benefits pursuant to [10 U.S.C. ch. 61]." DoDI 1332.18, § 6.7.[14] Whether a service member is retired or separated depends on the service member's years of service and the assigned disability rating percentage. *See* 10 U.S.C. § 1201(b) ("Required determinations of disability."). A service member receives a disability retirement if he or she has "at least 20 years of service" or a disability of "at least 30 percent." *Id.*; *see* DoDI 1332.18, § 7.2.[15] A medically retired individual receives monthly disability payments for life. 10 U.S.C. § 1401.

---

[13] *See also* DoDI 1332.18, § 4 ("Provision of Legal Counsel in the DES").

[14] *See also* AFI 36-3212, ¶ 1.1 ("When deemed unfit, the Air Force (AF) transitions the member from service and, as appropriate, provides compensation when the member's military career ends due to a physical disability[.]" (citing DoDI 1332.18)).

[15] *See also* DoDI 1332.18, § 11.5.a ("Permanent Disability Retirement") ("If the Service member is unfit, retirement for a permanent and stable disability may be directed pursuant to Section 1201 or 1204 of Title 10, U.S.C. either: (1) When the total disability rating is at least 30 percent in accordance with the VASRD and the Service member has fewer than 20 years of service, computed pursuant to Section 1208 of Title 10, U.S.C.; or (2) When the Service member has at least 20 years of service, computed pursuant to Section 1208 of Title 10, U.S.C., and the disability is rated at less than 30 percent."); Def. Fin. & Acct. Serv., *Qualifying for a Disability Retirement*, https://www.dfas.mil/retiredmilitary/disability/disability/ (last visited May 2, 2023) (explaining that a service member with "less than 20 years of active service [and] a disability rating of 30 percent or higher will qualify . . . for retirement," and a service member with 20 or more years of active service will receive a disability retirement "regardless of [the] disability rating"); *see also* 10 U.S.C. § 1201(b)(3)(A) (providing that a member is retired with monthly benefits, even if his disability is rated at less than thirty percent, if he "has at least 20 years of service computed under [10 U.S.C. § 1208]").

Conversely, service members are "separated" with a lump-sum payment when the service member has fewer than twenty years of service and the disability is less than thirty percent.  10 U.S.C. § 1203(b); DoDI 1332.18, § 7.4.[16]

Thus, if a service member has less than twenty years of service, his or her disability rating determines the nature of the payment.  *Schmidt v. Spencer*, 319 F. Supp. 3d 386, 389 n.1 (D.D.C. 2018), *aff'd sub nom. Schmidt v. McPherson*, 806 F. App'x 10 (D.C. Cir. 2020). Thirty percent is the "magic number."  Paul Jennings, *The Battle After War: Why Disabled Texas Veterans Are Fighting for the Military Retirement They Deserve*, 17 Tex. Tech. Admin. L.J. 153, 163 (2015).  To reiterate, a rating of less than thirty percent will result in a "medically separated" designation leading to a one-time lump sum disability severance payment.  *See* 10 U.S.C. §§ 1203, 1212.  A rating of at least thirty percent will result in a disability retirement with monthly payments for life.  *See* 10 U.S.C. § 1201(a)–(b); 10 U.S.C. § 1401 ("Computation of retired pay").[17]

### D. Disability Ratings

Disability ratings are assigned pursuant to the VA Schedule for Rating Disabilities ("VASRD"), located at 38 C.F.R. Chapter I, Part 4 ("Schedule for Rating Disabilities").  As part of the National Defense Authorization Act for Fiscal Year 2008, Congress sought to "eliminate unacceptable discrepancies and improve consistency among disability ratings" between the VA and the military departments.  *See* Pub. L. No. 110–181, § 1612, 122 Stat. 3, 442 (2008).  In furtherance of that goal, Congress required the military Secretaries to utilize the VASRD, "including any applicable interpretation of [the] schedule by the United States Court of Appeals for Veterans Claims."  10 U.S.C. § 1216a.[18]

---

[16] *See* DoDI 1332.18, § 11.5.c ("Separation with Disability Severance Pay"); *Qualifying for a Disability Retirement*, *supra* note 15 (explaining how a service member with "less than 20 years of active service" plus "a disability rating below 30 percent will result in separation").

[17] If the member does not have twenty years of service, but receives at least a thirty percent disability rating, then the member must further satisfy additional criteria to establish that the disability was service-connected.  10 U.S.C. § 1201(b).  As the parties no longer dispute that Mr. Keltner incurred PTSD in the line of duty, these criteria are not at issue in this case.

[18] *See also* DoDI 1332.18, § 8.1.a(1) ("The Secretaries of the Military Departments may not deviate from the VASRD, including any applicable interpretation of the VASRD by the U.S. Court of Appeals for Veterans Claims, U.S. Court of Appeals for the Federal Circuit, or U.S. Supreme Court.").  While DoD components must only apply the VASRD "to the extent feasible," 10 U.S.C. § 1216a(a)(1)(A), DoD directs that "any determination of infeasibility must be based on statutory differences between the DoD and VA disability systems, compelling differences in mission grounded in statute, or some other major difference between the two systems."  DODI 1332.18, § 8.1.b.  In contrast, "[a] policy disagreement or differing medical opinion does not constitute infeasibility."  *Id.*

Following the statutory instruction, DoD issued a policy memorandum specifically adopting 38 C.F.R. § 4.129, a VA regulation that sets a minimum initial disability rating for "mental disorders due to traumatic stress."[19] This VA regulation provides:

> When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted.

38 C.F.R. § 4.129.[20]

The next year, in 2009, the Office of the Under Secretary of Defense for Personnel and Readiness issued a memorandum governing record corrections for service members with PTSD.[21] This memorandum instructed that boards for correction of military records ("BCMRs") must apply section 38 C.F.R. § 4.129 in assessing "PTSD unfitting conditions for applicants discharged after September 11, 2001, and . . . assign a disability rating of not less than 50% for PTSD unfitting conditions for an initial period of six months . . . with subsequent fitness and PTSD ratings based on the applicable evidence." 2009 DoD Memo.

For service members proceeding through the IDES process, DoD requires the military services to apply the VA's disability rating. *See* DoDI 1332.18, § 8.1.d(3) ("[T]he PEB will apply ratings provided by the VA for unfitting conditions to establish the Service member's DoD disability rating under the IDES process."); AFI 36-3212, ¶ 1.10.1 ("The PEB assigns the disability rating percentage(s) provided by the Department of Veterans Affairs Rating Agency Site for unfitting medical conditions of service members in the

---

[19] Def. MJAR App'x at 1, 21 (David S.C. Chu, Under Sec'y of Def. for Pers. & Readiness, Memorandum for Secretaries of the Military Departments et al., *Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008 (Pub. L. 110–181)*, attach. § E7.2 (Oct. 14, 2008)); *see also Kaster v. United States*, 158 Fed. Cl. 86, 94 (2022) (describing this memorandum).

[20] Specifically, "for disposition of Service members found unfit because of a behavioral disorder due to traumatic stress," ratings are assigned pursuant to 38 C.F.R. §§ 4.129–.130. DoDI 1332.18, § 8.2 ("Behavioral Disorders Due to Traumatic Stress").

[21] Def. MJAR App'x at 26 (Gail H. McGinn, Deputy Under Sec'y of Def. for Plans, Memorandum for Secretaries of the Military Departments, *Requests for Correction of Military Records Relating to Disability Ratings for Post Traumatic Stress Disorder* (July 17, 2009) [hereinafter 2009 DoD Memo]).

IDES[.]").[22]  That does not mean the disability rating percentages determined via the IDES process will *always* be identical to the VA's *total* rating.  Indeed, "[t]he total combined disability ratings determined by the IDES and those determined by the VA may differ." AFI 36-3212, ¶ 1.11.  Such discrepancies may occur because "[t]he VA is authorized to rate any service-connected condition while the [military service] is only authorized to rate or apply ratings to the conditions which make a service member unfit for continued military service and cause the premature termination of the member's military career." *Id.*

### E.  The TDRL

The purpose of the TDRL is "to further observe unfit members whose disability has not stabilized and for whom the PEB cannot accurately assess the degree of severity, percent of disability, or final disposition."  AFI 36-3212, ¶ 8.2 ("Initial Placement").  The TDRL thus "serves as a safeguard for both the service member and the [Air Force] by delaying permanent disposition for service members whose conditions could improve or get worse, or where the ultimate disposition could change within a reasonable period of time."  *Id.*[23]

Section 1202 of Title 10 of the United States Code governs a member's placement on the TDRL.  *See Dambrava v. OPM*, 466 F.3d 1061, 1062–63 (Fed. Cir. 2006) (discussing 10 U.S.C. § 1202 in the context of a claim for "civil service retirement credit and annual leave credit for . . . time spent on the TDRL").  If a military Secretary determines that a service member would qualify for a disability "retirement under [10 U.S.C. §] 1201 . . . but for the fact that his disability is not determined to be of a permanent nature and stable, the Secretary shall, if he also determines that accepted medical principles indicate that

---

[22] *See also* DoDM 1332.18, § 3.1 (explaining that, for the IDES, "[t]he VA provides examinations, proposes disability ratings, and determines entitlement to veterans' benefits for all service-connected disabilities"); B. Asch, J. Hosek, & M. Mattock, *Toward Meaningful Military Compensation Reform: Research in Support of DoD's Review* 123 (2014), https://www.rand.org/content/dam/rand/pubs/research_reports/RR500/RR501/RAND_RR501.pdf ("The PEB determines which specific conditions make the member unfit for duty, and the VA determines the disability rating for each medical condition.  The PEB calculates the DoD disability rating by combining the individual ratings for all medical conditions determined to be unfitting.  Using the same ratings, the VA calculates a combined VA disability rating for *all* service-related medical conditions, not just those for conditions determined to be unfit for service.  The service member is counseled on all findings at the MEB and PEB stages, and elects to concur or not concur with the PEB fit/unfit decision and VA ratings.").

[23] *See also OUSD(P&R) Report to Congress, supra* note 8, at 6 ("The TDRL has evolved into a vehicle to provide a safeguard both to Service members whose condition may develop into a more serious permanent disability and to the government against permanently retiring a member who may subsequently fully recover (or nearly so) from the condition that led to them being placed on the list in the first place.").

the disability may be of a permanent nature, place the member's name on the [TDRL]." 10 U.S.C. § 1202.  In other words, service members are "placed on the TDRL when they meet the requirements for permanent disability retirement, except when the disability is not determined to be stable but may be permanent."  DoDI 1332.18, § 9.1 ("Initial Placement on the TDRL").

A member on the TDRL must be given a physical examination at least once every eighteen months "to determine whether there has been a change in the disability for which he was temporarily retired."  10 U.S.C. § 1210(a).  For service members diagnosed with PTSD, "the reexamination will be scheduled within 6 months from the date of placement on the TDRL, but completed no earlier than 90 days after placement on the TDRL."  DoDI 1332.18, § 9.2 ("TDRL Re-Evaluation").  If a periodic reexamination demonstrates that the disability "is of a permanent nature and stable," then the member is either separated or retired.  10 U.S.C. § 1210(c)–(e).  "A disability will be determined stable when the preponderance of medical evidence indicates the severity of the condition will probably not change enough within the next [five] years to increase or decrease the disability rating percentage."  AFI 36-3212, ¶ 3.17.3 (altered to reflect the prior statutory language applicable in this case); *see also id.* ¶ 8.1 ("Permanence of Condition"); DoDI 1332.18, § 9.1 (providing that, for a disability to be determined stable, the preponderance of medical evidence must indicate that "the severity of the condition will probably not change enough within the next [five] years to increase or decrease the disability rating percentage, pursuant to [10 U.S.C. § 1210]" (also altered to reflect the applicable statutory language)).[24]

Pursuant to 10 U.S.C. § 1210, "[v]eterans placed on the TDRL before January 1, 2017[,] may remain on the TDRL for no more than 5 years after placement."  DoDM 1332.18, § 10.6.b ("TDRL Termination").[25]  Accordingly, if a member has been on the TDRL for five years and continues to suffer from the disability, then "it shall be

---

[24] On the other hand, "[s]ervice members with unstable conditions rated at least 80 percent," who "are not expected to improve to less than an 80 percent rating, will be permanently retired."  DoDI 1332.18, § 9.1.b.

[25] Through December 31, 2016, 10 U.S.C. § 1210(b) provided: "[t]he Secretary concerned shall make a final determination of the case of each member whose name is on the [TDRL] *upon the expiration of five years* after the date when the member's name was placed on that list.  If, at the time of that determination, the physical disability for which the member's name was carried on the [TDRL] still exists, it shall be considered to be of a permanent nature and stable."  National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114–328, § 525, 130 Stat. 2000, 2117 (2016) (emphasis added) (amending the statute to replace "five years" with "three years," which "shall apply to members of the Armed Forces whose names are placed on the [TDRL] on or after [January 1, 2017]").  The parties do not dispute that the previous version of the statute (*i.e.*, with the five year requirement), applicable through December 31, 2016, governs this case.

considered to be of a permanent nature and stable," and the member is separated or retired. 10 U.S.C. § 1210(b) (2016).

In sum, there are two avenues for identifying a service member's disability as "permanent and stable" in order to remove the service member from the TDRL. First, pursuant to 10 U.S.C. § 1210(a), a medical examination may determine that a disability is permanent and stable. *See Cronin v. United States*, 765 F.3d 1331, 1336 (Fed. Cir. 2014) (citing 10 U.S.C. § 1210(a)–(b)). Second, a disability will be deemed permanent and stable pursuant to 10 U.S.C. § 1210(b) once the service member has been on the TDRL for five years. Either way, "retirement or separation follows, depending on the degree of disability and length of service." *Cronin*, 765 F.3d at 1336 (citing 10 U.S.C. § 1210(c)–(e)); *see also* AFI 36-3212, ¶ 8.19 ("Recommended Disposition") (providing possible dispositions for a service member on the TDRL).

When the PEB reevaluates a service member already on the TDRL, "[t]he Military Department will request that the VA provide their most current rating and medical evidence upon which the most current rating was based for the condition for which the veteran was placed on the TDRL." DoDI 1332.18, § 9.2.c(1). Pursuant to DoDM 1332.18:

> VA will conduct exams *and prepare rating decisions* for veterans who were temporarily retired for disability in accordance with VA laws and regulations. VA will provide a copy of the most current rating and the medical evidence upon which the most current rating is based in accordance with Section 7332 of Title 38, U.S.C. If VA does not provide examination and rating information sufficient to adjudicate the veteran's case or if the most recent VA exam is older than 18 months, the Military Department will execute required TDRL examinations and ratings in accordance with Title 38, CFR.

DoDM 1332.18, § 10.4 ("TDRL Reevaluation") (emphasis added); *see also* AFI 36-3212 attach. 1 at 75 ("The IDES features a single set of disability medical examinations appropriate for fitness determination by the Military Departments and a single set of disability ratings provided by VA for appropriate use by both departments."); *but see* AFI 36-3212, ¶ 3.18 ("The PEB applies VA ratings provided by the Department of Veterans Affairs Rating Activity Site for IDES cases . . . ; however, for LDES and *TDRL cases*, the *PEB* utilizes the VASRD to *determine a rating* for each unfitting condition." (emphasis added)); AFI 36-3212, ¶ 1.10.2 ("The *PEB* will *assign* a disability rating percentage(s) to unfitting medical conditions using the current VASRD for service members in the [LDES] *and for TDRL reevaluations*." (emphasis added)).

Service members also have appellate rights following the FPEB process. *See* DoDI 1332.18, § 3.3.d ("Appeal of FPEB Determination of Fitness"), § 4.4 ("Service Member

Appeals and Hearings"). The Air Force specifically provides that "Airmen have the option to apply to the [AFBCMR] if they believe, and have evidence, that an error or injustice occurred." AFI 36-3212, ¶ 5.4.5.

## II. FACTUAL AND PROCEDURAL BACKGROUND[26]

### A. Mr. Keltner's Military Service and PTSD

Mr. Keltner enlisted in the Air Force in 2001 and entered active duty service in 2002. AR 25, 71. He deployed to Pakistan in 2003, transitioned to the Air Force Reserve in 2006, and deployed again to Iraq in 2008. AR 71, 208. In 2011, Mr. Keltner deployed to Afghanistan for his third and final combat tour. AR 208. While serving in Afghanistan, his forward operating base was constantly attacked by mortars and rockets, sometimes six times a day. *Id.* On one occasion, a mortar detonated a hundred yards from him. AR 189. He rode in helicopters that were fired at, saw wounded soldiers and dead bodies, and his base received threats of being "overrun" by the Taliban. AR 189, 199, 208. He believed that the soldiers working on that base were always in imminent danger. AR 189. The stressors Mr. Keltner experienced in Afghanistan, alongside the simultaneous disintegration of his marriage, caused him to develop mental health problems. *Id.*

In August 2012, a few months after Mr. Keltner returned to the States following his tour of duty in Afghanistan, the Air Force gave him a Post-Deployment Health Re-Assessment. AR 1033. The examiner found that Mr. Keltner had PTSD symptoms and referred him to a behavioral health specialist. AR 1037. A few months later, Mr. Keltner began taking antidepressant and anti-anxiety medication. AR 281. In December 2012, while on orders, Mr. Keltner told several members of his unit that he "would have killed himself if he wasn't a Christian." AR 264. One of his commanders immediately reported this to military health professionals and Mr. Keltner was taken to the emergency room for evaluation. AR 262.

The following year, in September 2013, Mr. Keltner went to a VA clinic for PTSD screening. AR 272. He reported difficulty concentrating, frequent alcohol use, occasional panic attacks, hypervigilance, irritability, intrusive thoughts, being easily startled, extra anxiety in public and loud places, and nightmares. *Id.* He subsequently complained to the Air Force of PTSD symptoms resulting from his deployment in Afghanistan and

---

[26] This background section constitutes the Court's principal findings of fact drawn from the administrative record. Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Citations to the administrative record (ECF Nos. 63-1 to -7) are denoted as "AR" followed by the page number indicated at the bottom right corner of the page.

depression from his recent divorce. AR 280–82. On or about September 17, 2013, an Air Force psychologist diagnosed Mr. Keltner with "Adjustment Disorder with Anxiety and Depression, Chronic." AR 284.

A few months later, in December 2013, the Air Force found that Mr. Keltner had a "Non-Duty" physical disqualification that precluded him from future deployment. AR 239. The report noted that the Air Force would need to process Mr. Keltner through its DES if he sought to continue his military service, and he was referred to a PEB, accordingly. *Id.* In April 2014, an IPEB determined that Mr. Keltner was unfit for continued military service. AR 20. Mr. Keltner requested a fitness determination from a FPEB, but he failed to appear for his August 2014 hearing. AR 17–19.[27]

### B. Mr. Keltner's Discharge and AFBCMR Application

In April 2015, the Air Force initiated an "*Administrative* Discharge due to Physical Disqualification." AR 241 (emphasis added). In June of that year, Mr. Keltner applied to the AFBCMR for relief, arguing that his mental health issues were combat related and requesting that he be given a *medical* discharge with severance pay (rather than an administrative discharge). AR 7, 13. He explained that after returning from Afghanistan he was "afraid to tell [his] unit's psychiatrist that [he] was suffering from PTSD in fear of getting kicked out of the military so [he] only brought the depression and anxiety to the psychiatrist's attention." AR 13. He also explained that he had waived his right to a FPEB because he assumed he would be medically discharged and given a severance package. *Id.* The Air Force finalized Mr. Keltner's administrative discharge in February 2016, notwithstanding that his appeal to the AFBCMR remained pending. AR 16.

### C. The VA's Fifty Percent Disability Rating for Mr. Keltner's PTSD

On or about August 31, 2016, roughly six months after the Air Force administratively discharged Mr. Keltner, he received a VA Compensation and Pension examination (the "August 2016 VA C&P Examination"). AR 1080–96. As part of that examination, a VA psychologist found that Mr. Keltner was suffering from PTSD with "mild to moderate symptoms overall." AR 1080. He was also diagnosed with an unspecified anxiety order, an unspecified depressive disorder, alcohol use disorder, and sleep apnea. *Id.* The anxiety and depression were deemed "progression[s] of the adjustment disorder symptoms that were observed during his service"; the psychologist found those diagnoses at least partially related to Mr. Keltner's PTSD. *Id.* The VA psychologist similarly concluded that alcohol was "likely used as a maladaptive coping mechanism" to help assuage other symptoms. AR 1080–81.

---

[27] The government does not contend that Mr. Keltner's failure to appear for the FPEB impacts his claim before this Court.

The VA psychologist described Mr. Keltner's mental health troubles in extensive detail. AR 1090. Mr. Keltner reported having panic attacks at least once per day, characterized by a racing heart, shortness of breath, shakiness in his knees, and feeling like he was losing control. *Id.* He relayed fears of "bombs going off, explosions, or dying"; hypervigilance; and heightened feelings of fear when driving. *Id.* He described serious social anxiety, noting "physical tension along with sweating, feeling like his eyes get red, stammering, stuttering, and lapses in concentration in the middle of conversations." *Id.* He had trouble concentrating and would forget conversations. *Id.* He also had problems sleeping most nights — "his mind just race[d] over things" since he returned from Afghanistan. *Id.*

The August 2016 VA C&P Examination further memorialized that Mr. Keltner reported "feel[ing] down and depressed on a daily basis for most of the day." AR 1090. He first remembered feeling depressed "for a couple of weeks or more right after his return from Afghanistan," noting that he felt guilty for leaving the United States for Afghanistan and sending his family to Arizona. *Id.* He indicated a loss of interest in activities he previously enjoyed, like working on his house, playing video games, and playing pool and darts in social settings. *Id.* His "energy level [was] low" and he felt "tired a lot." *Id.* He described occasional feelings of worthlessness. *Id.* He denied "current suicidal ideation," but described "passive suicidal ideation" about once a month, including during the week before the psychological examination. *Id.*

Despite this raft of symptoms, the VA examiner — in the "occupational and social impairment" section of the examination form — checked a box indicating that Mr. Keltner had "mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or[] symptoms controlled by medication." AR 1081. This language comes directly from the VASRD criteria for a disability rating of ten percent. *See* 38 C.F.R. § 4.130 ("Schedule of ratings — Mental disorders").

Three weeks after the August 2016 VA C&P Examination, the VA's Veterans Benefits Administration, on September 21, 2016, issued its disability rating decision (the "VA Rating Decision"). AR 1072–78. After considering the totality of Mr. Keltner's medical records from 2008 through the August 2016 VA C&P Examination, the VA found that Mr. Keltner's PTSD — "to include depressive disorder, anxiety disorder, and alcohol use disorder" — was service connected and warranted a fifty percent disability rating based on the VASRD. AR 1072–73; *see* 38 C.F.R. § 4.130 (definition of a fifty percent disability rating).

The VA Rating Decision detailed Mr. Keltner's symptoms and explained that the "overall evidentiary record show[ed] that the severity of [his] disability most closely approximates the criteria for a 50 percent disability evaluation." AR 1074 (applying the definition of a fifty percent disability rating from 38 C.F.R. § 4.130). The VA Rating

Decision also explained that Mr. Keltner's PTSD did not warrant "[a] higher evaluation of 70 percent" based on the VASRD criteria. *Id.* (referring to the definition of a seventy percent disability rating from 38 C.F.R. § 4.130). The VA further indicated that Mr. Keltner had received a ten percent disability rating for tinnitus in June 2008, thus yielding a total sixty percent "combined [disability] evaluation for compensation." AR 1077.

### D.  The AFBCMR's First Decision

On September 22, 2016, the day after the VA issued its rating decision, a psychiatric advisor to the AFBCMR recommended a starkly different disability rating to the Board. AR 77–82. Relying primarily on the August 2016 VA C&P Examination's indication that Mr. Keltner suffered "mild or transient" occupational and social impairment, the psychiatric advisor recommended a disability rating of just ten percent. AR 81. The psychiatric advisor neither discussed Mr. Keltner's specific symptoms noted a few weeks before in the August 2016 VA C&P Examination, nor considered the VA's final PTSD disability rating of fifty percent. *Id.* On the other hand, the Air Force psychiatric advisor *did* conclude that the Air Force's April 2015 administrative discharge decision "represented an error," and thus recommended that the Air Force accept the diagnosis of PTSD and find that it was received in the line of duty. AR 82 (recommending that the Board "[p]lace applicant on the [TDRL] with a rating of 50 percent in accordance with 38 CFR 4.129, effective February 5, 2016[,]" and "[r]emove the applicant from TDRL on August 31, 2016 and discharge with the rating of 10 percent in agreement with the [August 2016 VA C&P Examination]").

In December 2016, the AFBCMR denied Mr. Keltner's request for a medical discharge with severance pay. AR 1–2. Although the Board "note[d] the comments of [the] Psychiatric Advisor indicating that relief should be granted," the Board determined that Mr. Keltner's mental health problems were not "a result of military stressors," so the applicant "had not been a victim of error or injustice." AR 3, 5.

### E.  Mr. Keltner's Initial Claims Before this Court

On May 3, 2019, Mr. Keltner filed suit in this Court, claiming that the Air Force improperly withheld retirement pay and benefits owed to him pursuant to 10 U.S.C. § 1201. ECF No. 1. Mr. Keltner claimed that his PTSD was incurred in the line of duty and argued that the Air Force's failure to complete a line of duty determination, its failure to correct the record, and its reliance on an unsubstantiated advisory opinion were unlawful. *Id.* at 14–17. He requested that this Court order the Air Force to correct his military records to reflect: (1) that his PTSD was combat related; (2) that his PTSD warranted a disability rating of fifty percent; and (3) that he is owed commensurate disability retirement pay and benefits. *Id.* at 17.

On November 1, 2019, the government filed a motion for voluntary remand to the Board. ECF No. 9. On June 3, 2020, this Court denied the government's motion because the AFBCMR's concern was not "substantial and legitimate" when it sought only to "expound upon its rationale for denying plaintiff's request." *Keltner v. United States*, 148 Fed. Cl. 552, 563–65 (2020) (quoting Def. Mot. at 1). On July 1, 2020, the Court ordered a briefing schedule to resolve this case via motions for judgment on the administrative record ("MJARs"). ECF No. 28. Following oral argument on the parties' motions, *see* ECF Nos. 30, 33, and the government's renewed request to stay and remand the matter to the Board, *see* ECF No. 40, the Court ordered the parties to meet and confer and to file a joint status report with a proposal for how the case should proceed, ECF No. 46.

## F. The Parties' Joint Remand Request and the AFBCMR's Second Decision, Separating Mr. Keltner with a Ten Percent Disability Rating

On May 14, 2021, the parties jointly proposed remanding this case to the AFBCMR with specific remand instructions. ECF No. 50. The government agreed to rescind its 2016 decision denying Mr. Keltner's disability retirement claims, to consider his claims without deference to the previous decision, and to issue a replacement decision within six months. *Id.* at 1–6. On May 19, 2021, the Court stayed this case and remanded it to the Board with the specific instructions to which the parties had agreed. ECF No. 51 (incorporating ECF No. 50). On June 23, 2021, Mr. Keltner amended his application to the Board, requesting that it correct his records to reflect his retirement with a disability rating of sixty percent — fifty percent from PTSD and ten percent from tinnitus. *See* ECF No. 58 at 6.

On November 23, 2021, the Board issued its second decision, granting Mr. Keltner's application in part. ECF No. 58 ("Second AFBCMR Decision") at 2. The decision found that Mr. Keltner's diagnosis of chronic adjustment disorder "was replaced with PTSD prior to his discharge," and that his PTSD was incurred in the line of duty. *Id.* at 14–15. The Board also corrected his record to reflect his placement on the TDRL as of January 22, 2016 — the day after Mr. Keltner was actually released from active duty — with a disability rating of fifty percent, pursuant to AFI 36-3212. *Id.* at 15.[28] The Board, however, then further "corrected" Mr. Keltner's record to reflect that he was "removed" from the TDRL on August 31, 2016 — the same day as his August 2016 VA C&P Examination — with a disability rating of only ten percent. *Id.*

---

[28] *See* Def. MJAR App'x at 28 (*Air Force Instruction (AFI) 36–3212*: *Physical Evaluation for Retention, Retirement, and Separation* (Nov. 27, 2009)); *see also* 38 C.F.R. § 4.129 ("When a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of not less than 50 percent[.]").

In deciding to amend Mr. Keltner's records to reflect that he was removed from the TDRL as of August 31, 2016, and in assigning him a disability rating of ten percent, the Second AFBCMR Decision relied primarily on a September 15, 2021, memorandum issued by yet another psychological advisor to the AFBCMR.  *See* AR 1048–52 (the "September 2021 AFRBA Memorandum");[29] Second AFBCMR Decision at 2, 6–11.  The September 2021 AFRBA Memorandum did not address the August 2016 VA C&P Examination in any detail.  Instead, it selectively quoted the "mild or transient symptoms" language from the August 2016 VA C&P Examination form corresponding to the VASRD's ten percent rating definition.  AR 1051.  The September 2021 AFRBA Memorandum did not address or even acknowledge that the August 2016 VA C&P Examination paints a far more concerning picture of Mr. Keltner's PTSD symptoms, which were more consistent with the fifty percent disability rating the VA ultimately assigned.  AR 1074 (noting, amongst other symptoms, suicidal ideation, chronic sleep impairment, and panic attacks more than once per week).  The psychological advisor in the September 2021 AFRBA Memorandum further opined that Mr. Keltner's PTSD "had stabilized," AR 1051, but did not identify a specific date for a stabilization finding.  Given that the psychological advisor made that comment after reviewing select medical records dated between March 11, 2016, and June 9, 2017,[30] the September 2021 AFRBA Memorandum implies that the stabilization date may not have been until at least June 9, 2017 — about nine months after the August 31, 2016, date that the Second AFBCMR Decision assessed.  AR 1068–69.

Following the remand, and at the Court's direction, Mr. Keltner filed an amended complaint on January 31, 2022, challenging the Second AFBCMR Decision on three grounds.  ECF No. 62 ("Am. Compl.").  First, Mr. Keltner alleges that his constructive removal from the TDRL without the "requisite" procedural protections was unlawful.  *Id.* at 12–13 (Count I) (alleging violations of 10 U.S.C. §§ 1202, 1210, and 1214).  Second, he alleges that the Air Force's decision to assign him a final disability rating of only ten percent violated the requirement of resolving reasonable doubt in favor of a service member.  *Id.* at 13 (Count II) (alleging violations of 10 U.S.C. § 1216a and 38 C.F.R. §§ 4.3, 4.7).  Third, he alleges that the Air Force's final disability rating of only ten percent —

---

[29] The memorandum is signed by a psychological advisor with the AFRBA — the Air Force Review Boards Agency, *see Air Force Review Boards Agency Information Website and Application Portal*, https://afrba-portal.cce.af.mil/ (last visited May 2, 2023) ("The [AFRBA] was established to streamline the adjudication of military and civilian personnel matters through 11 statutory and secretarial boards and one review office. As a field operating agency, the AFRBA reports directly to the Assistant Secretary of the Air Force for Manpower and Reserve Affairs (SAF/MR).").

[30] The psychological advisor's chronological review of Mr. Keltner's medical history, AR 1068–69, conspicuously omits any discussion of the August 2016 VA C&P Examination's findings.

after the VA assigned him a disability rating of fifty percent — violated the "presumption of regularity." *Id.* at 13–14 (Count III).[31]

On April 29, 2022, Mr. Keltner filed a motion for judgment on the administrative record. ECF No. 64 ("Pl. MJAR"). On August 17, 2022, the government filed a cross-motion. ECF No. 68 ("Def. MJAR"). On September 30, 2022, Mr. Keltner filed his reply brief. ECF No. 71 ("Pl. Reply"). And on October 13, 2022, the government filed its reply. ECF No. 73 ("Def. Reply"). All filings were timely. On November 1, 2022, the Court held oral argument on the parties' cross-MJARs. ECF No. 75 ("Tr.").

## III.   JURISDICTION

Pursuant to the Tucker Act, the United States Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act "does not create any substantive right enforceable against the United States for money damages," the Court must determine whether the statute upon which a claim for money is based "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 398, 400, 402 (1976) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)).

Mr. Keltner's disability retirement claims, *see* Am. Compl. at 2, invoke 10 U.S.C. § 1201. Our appellate court, the United States Court of Appeals for the Federal Circuit, has held that 10 U.S.C. § 1201 is a money-mandating source of substantive law that is actionable in this Court pursuant to the Tucker Act. *Fisher v. United States*, 402 F.3d 1167, 1174–75 (Fed. Cir. 2005) (reaffirming *Sawyer v. United States*, 930 F.2d 1577 (Fed. Cir. 1991)); *see also Verbeck v. United States*, 89 Fed. Cl. 47, 61 (2009) ("[10 U.S.C. §] 1203 is a money-mandating statute for the same reasons that [10 U.S.C. §] 1201 is a money-mandating source of law for purposes of the jurisdiction of this court.").[32]

---

[31] Mr. Keltner does not challenge the Board's finding that his tinnitus was not compensable because it "was not found to be an unfitting condition." Second AFBCMR Decision at 14. Thus, Mr. Keltner no longer contends that the Board should have assigned him a sixty percent disability rating — fifty percent from PTSD and ten percent from tinnitus. *Id.* at 6.

[32] Depending on the precise money-mandating statute, "an appeal to a Correction Board constitutes a 'permissive' rather than a mandatory remedy." *Chambers v. United States*, 417 F.3d 1218, 1224 (Fed. Cir. 2005) (quoting *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc)). In a disability retirement case, however, "the Court of Federal Claims has no jurisdiction . . . until a military board evaluates a service member's entitlement to such retirement in the first instance." *Id.* at 1225.

Accordingly, this Court possesses jurisdiction to decide Plaintiff's claims.[33]

## IV.    STANDARD OF REVIEW

Ordinarily, Tucker Act claims — whether of the contract, money-mandating, or illegal exaction varieties — proceed before this Court "on a *de novo* basis." *L & D Servs., Inc. v. United States*, 34 Fed. Cl. 673, 678 n.6 (1996) ("Any litigation of a [contract] claim . . . before this court is on a *de novo* basis and the contractor may rely upon evidence not considered by the contracting officer."). That is, the Court does not defer to an agency's fact finding or conclusions, but instead receives new evidence, makes its own factual findings, and reaches an independent determination regarding whether a plaintiff has substantiated its claim by a preponderance of the evidence. *See, e.g., Ampersand Chowchilla Biomass, LLC v. United States*, 150 Fed. Cl. 620, 642 (2020) ("The Court reviews claims for tax refunds and [money-mandating statutory] claims . . . on a *de novo* basis."), *aff'd*, 26 F.4th 1306 (Fed. Cir. 2022); *Cherokee Gen. Corp. v. United States*, 150 Fed. Cl. 270, 283 (2020) ("Even where a contracting officer's legal opinion is fully explained (unlike here), it is not binding on the government in judicial proceedings (which are *de novo*) and it cannot override the language of the contract itself." (citing *Wilner v. United States*, 24 F.3d 1397, 1401–02 (Fed. Cir. 1994))); *Cencast Servs., L.P. v. United States*, 94 Fed. Cl. 425, 453 (2010) ("In general, a tax refund suit is a *de novo* proceeding and any subsidiary factual findings of the IRS are given no weight by the court."), *aff'd*, 729 F.3d 1352 (Fed. Cir. 2013); *Cnty. of Suffolk v. United States*, 19 Cl. Ct. 295, 299 (1990) ("The Claims Court typically considers allegations that a party did not fulfill its obligations under a contract on a *de novo* basis."); *Woog v. United States*, 48 Ct. Cl. 80, 94 (1913) ("The court is of opinion that the statute under which we are taking jurisdiction requires us to make an independent investigation and to afford relief irrespective of the findings of any board.").[34]

Where Congress wants this Court to apply a different, more deferential standard of review, Congress knows how to issue such instructions. The most common example is, of course, the Administrative Procedure Act's arbitrary and capricious standard of review, which Congress expressly applied to actions challenging government procurement-related decisions pursuant to 28 U.S.C. § 1491(b). *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Congress has imposed the

---

[33] Although every court has a duty to confirm its jurisdiction, *see, e.g.,* RCFC 12(h)(3), this Court notes that the government has not challenged jurisdiction in this case.

[34] *But see Fla. Home Med. Supply, Inc. v. United States*, 131 Fed. Cl. 170, 177–78 (2017) (contrasting a breach of contract case — where "[t]he evidence that plaintiffs may offer is governed by the relevant rules of this court, and is not limited to the information previously provided to [the agency]" — and "[t]he court's review of an agency decision," which "is limited to an administrative record and is conducted under a deferential 'arbitrary, capricious, contrary to law, or unsupported by substantial evidence' standard" (citations omitted)).

arbitrary and capricious standard in other instances as well.  *See, e.g.*, 50 U.S.C. § 4215(h)(1) ("A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); 42 U.S.C. § 300aa-12(e) (providing that "the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of [vaccine injury] proceedings and may thereafter . . . set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Military pay cases — including disability retirement cases — involve money-mandating claims, *see* Section III, *supra*.[35]  In such cases, Congress has neither required this Court to apply the APA's standard of review by express reference to that statute, nor otherwise directly imposed the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" formulation.  Nevertheless, "[a]s Mr. Justice Holmes commented . . .[,] 'a page of history is worth [a] volume of logic.'"  *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 675–76, (1970) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).  And the history makes quite clear that our Court, and our predecessor and appellate tribunals, have consistently applied the arbitrary and capricious standard of review since at least 1954.  *Gordon v. United States*, 121 F. Supp. 625, 629 (Ct. Cl. 1954) ("By this application plaintiff invoked the jurisdiction of the Army Board on Correction of Military Records and was bound by the terms thereof unless the resulting action of the board was arbitrary or capricious, etc., or was in violation of some other substantive right."); *see Brown v. United States*, 396 F.2d 989, 991 (Ct. Cl. 1968) ("Since Congress has vested the Service Secretaries (acting on the recommendation of the various physical disability and correction boards) with such discretion in determining eligibility for disability-retired pay, we have always adhered to that scope of review." (footnotes omitted)).[36]  The Supreme Court also has long endorsed this deferential standard of review, although it has never concluded that the APA literally applies to these cases.  *See*

---

[35] *Friedman v. United States*, 158 F. Supp. 364, 376 (Ct. Cl. 1958) ("[T]he sort of 'review' contemplated in an action to recover lost pay in the Court of Claims is an original suit for a money judgment and not a review looking to the alteration or correction of an official military record or to the compelling of official action by an officer of an executive department.  And such 'reviews' by this court to determine whether or not pay has illegally been withheld from a member or former member of the military services, have long been sanctioned by this court and the Supreme Court." (citing cases)).

[36] This is true even where "resort to a correction board is not mandatory."  *Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006) (citing *Martinez*, 333 F.3d at 1305, and explaining that "where, as here, a service member has elected to pursue relief before a corrections board, we have reviewed the board's decision to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law" (other citations omitted)).

*Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (explaining that correction board "decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence" (citing *Grieg v. United States*, 640 F.2d 1261 (Ct. Cl. 1981) and *Sanders v. United States*, 594 F.2d 804 (Ct. Cl. 1979))).[37]   Indeed, Supreme Court precedent supporting the application of the arbitrary and capricious standard of review to military pay cases apparently pre-dates the APA.  *See Wales v. United States*, 130 F. Supp. 900, 904 (Ct. Cl. 1955) (holding that arbitrary and capricious standard of review applies to BCMR findings and that "the doors of this court are always open to grant relief to a party aggrieved by the action of an executive or administrative officer which is arbitrary or capricious" because "[t]he Supreme Court has long recognized the right of the court to review such action" (internal citations omitted) (citing *Dismuke v. United States*, 297 U.S. 167, 171–72 (1936))).

Perhaps because the APA does not actually apply to Tucker Act claims,[38] binding authority from the Court of Claims "permit[ed] the taking of *de novo* evidence by the [trial court]" in military pay cases.  *Beckham v. United States*, 375 F.2d 782, 785 (Ct. Cl. 1967);[39] *see Brown*, 396 F.2d at 991–92 ("We have also, since we first began dealing with disability retirement two decades ago, regularly considered evidence over and above that presented before the administrative boards if a party wishes to offer it. . . . This coupling of the substantial-evidence standard with the acceptance of  new evidence has not . . . encroached on the administrative process.").  In *Brown*, the Court of Claims reasoned that the military disability administrative process "as a whole, is not designed to collect and evaluate for itself all the evidence bearing on the issue of disability, nor is it geared

---

[37] *See also Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999) ("A servicemember claiming something other than monetary relief may challenge a BCMR's decision . . . as final agency action under the [APA] . . . in the district courts" or "[i]n the instances in which a claim for monetary relief may be framed, a servicemember may enter the Court of Federal Claims with a challenge . . . under the Tucker Act, 28 U.S.C. § 1491" (citations omitted)).

[38] *See Bowen v. Massachusetts*, 487 U.S. 879 (1988); *District of Columbia v. United States*, 67 Fed. Cl. 292, 305 (2005) (contrasting "two waivers of sovereign immunity" — "[t]he first is found in the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the foundation of this court's jurisdiction, and the second is found in the [APA], 5 U.S.C. §§ 701–706 (2000), which gives United States district courts jurisdiction over certain claims 'seeking relief other than money damages' against the United States, *id.* § 702" (footnote omitted)).

[39] *See Beckham*, 375 F.2d at 785 ("In determining the arbitrariness, capriciousness, or insubstantiality of an administrative decision, it is not necessary that the review always be restricted to the record before the administrative body. . . . This has not prevented the court from applying its substantial evidence test to the findings of the Board.  All that this procedure has done is to expand our substantiality test.  We do not ask if the Board decision is supported by substantial evidence upon an inspection of the record, but instead, we ask if the decision meets the test when compared with all available evidence — that is both the record and the *de novo* evidence.").

to produce records comparable to those of the regulatory agencies."  396 F.2d at 996. Thus, "[t]he character of the administrative process in military disability-retirement cases . . . strongly suggests the propriety of our established practice of accepting *de novo* evidence in this area."  *Id.*

Notwithstanding that *Beckham* and *Brown* are consistent with the money-mandating nature of military pay claims — and even though Congress never applied the APA to military pay claims in Tucker Act cases — the Federal Circuit, in a split panel decision,[40] concluded that "it has become well established that judicial review of decisions of military correction boards *is conducted under the APA*."  *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009) (emphasis added and footnote omitted).[41]  The Federal Circuit thus applied APA cases and procurement protest decisions to find that our review of military pay claims "is generally limited to the administrative record."  *Walls*, 582 F.3d at 1367–68 (Fed. Cir. 2009) (discussing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009); and *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)).[42]  Judge Wolski's summary of the standard of review, however, is more accurate: "[t]he Court reviews the decision of a Secretary acting through a Correction Board

---

[40] Judge Newman dissented at length.  *See Walls*, 582 F.3d at 1369–81 (Newman, J., dissenting) ("The *Brown* ruling continues to be the law of this circuit." (footnote omitted) (citing *Bray v. United States*, 515 F.2d 1383 (Ct. Cl. 1975) amongst other cases)).  Judge Newman maintained that "[n]o authority disturbs the long-standing rulings that because of the nature of correction board proceedings, augmentation of the administrative record is permissible" and that "[t]he APA does not exclude this approach."  *Id.* at 1376.

[41] *See also Pearl v. United States*, 111 Fed. Cl. 301, 303 n.1 (2013) (noting that "[a]lthough the APA [is] explicitly cited only in the portion of the Tucker Act pursuant to which this court exercises jurisdiction in bid protests, *see* 28 U.S.C. § 1491(b)(4), 'it has become well established that judicial review of decisions of military corrections boards is conducted under the APA' standard of review" (quoting *Walls,* 582 F.3d at 1367)).

[42] *Walls* relied on two earlier Federal Circuit cases for the proposition that this Court applies the APA in reviewing decisions of military correction boards:  *Metz v. United States*, 466 F.3d 991 (Fed. Cir. 2006), and *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005).  *See Walls*, 582 F.3d at 1367 n.11.  But neither case mentions the APA even a single time.  *Metz*, consistent with precedent, simply noted that "the Court of Federal Claims reviews the Board's action under the same standard as any other agency action," while acknowledging that, fundamentally, military pay claims are money-mandating claims under the Tucker Act.  466 F.3d at 995–98.  Similarly, *Fisher* recognized the money-mandating nature of a disability retirement pay claim and explained the standard of review based on "controlling precedents," but did not invoke the APA.  *Id.* at 1174, 1180 ("The cases are consistent that this review is conducted under a deferential standard of review, *essentially the standard under which administrative agency decisions are reviewed*" (emphasis added)).

according to a standard *borrowed from* the [APA]." *Brooks v. United States*, 65 Fed. Cl. 135, 140 (2005) (emphasis added and citation omitted).[43]

The upshot of this history is that our Court resolves military pay claims via cross-motions for judgment on the administrative record, pursuant to RCFC 52.1. That process "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354, 1356 (applying this standard in a bid protest case); *see Doyon v. United States*, 58 F.4th 1235, 1242 (Fed. Cir. 2023) (explaining, in a case involving the Board for Correction of Naval Records, that the Federal Circuit "review[s] a decision of the Court of Federal Claims granting or denying a motion for judgment on the administrative record without deference" (citations and quotations omitted)).[44] The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof under the applicable standard of review, based on the evidence in the administrative record. *Bannum*, 404 F.3d at 1356–57.

Particularly with respect to the scope of relief, however — just as in a procurement protest action pursuant 28 U.S.C. § 1491(b) — neither Federal Circuit precedent nor this Court's rules preclude the consideration of evidence outside of the agency's record. *See Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 578 n.45 (2021) ("The Court's consideration of such extra-record evidence is appropriate when evaluating prejudice or the propriety of injunctive relief." (citations omitted)); RCFC 52.1, Rules Comm. Notes

---

[43] The Federal Circuit's predecessor, the Court of Claims, similarly borrowed "[APA]-type review" for other money-mandating claims. *Foote Mineral Co. v. United States*, 654 F.2d 81, 84–85 (Ct. Cl. 1981) (applying "[APA]-type review" to a refund claim brought pursuant to 43 U.S.C. § 1734(c) (1976), and citing a military pay case, *Sanders v. United States*, 594 F.2d 804 (Ct. Cl. 1979)). As to whether it makes sense to apply APA case law wholesale in such cases, Judge Wolski observed that the more recent "convention of restricting review to the administrative record seems to conflict with the express holding of the Federal Circuit that plaintiffs challenging Correction Board determinations are 'entitled' to supplement this record with additional evidence." *Brooks*, 65 Fed. Cl. at 150 n. 22 (quoting *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)); *see also Joslyn v. United States,* 110 Fed. Cl. 372, 388 (2013) ("Both the record and the *de novo* evidence are considered to determine whether the decision of the military disability evaluation board was supported by substantial evidence." (citing *Beckham*, 375 F.2d at 785)).

[44] *See also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012) (explaining that military pay claims and this Court's review of military correction board decisions may be decided via motions for judgment on the administrative record pursuant to RCFC 52.1, which "provides a procedure for parties to seek the equivalent of an expedited trial on a 'paper record, allowing fact-finding by the trial court'" (quoting *Bannum*, 404 F.3d at 1356)); *Acevedo v. United States*, 216 F. App'x 977, 979 (Fed. Cir. 2007) (explaining that this Court, in reviewing decisions of the Army Board for the Correction of Military Records, "is required to make factual findings under [RCFC] 52.1 from the record as if it were conducting a trial on the record" (footnote omitted) (citing *Bannum,* 404 F.3d at 1355–57)).

(2006) ("Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings.").

## V.       DISCUSSION: MR. KELTNER'S MJAR IS GRANTED

The parties' pending motions for judgment on the administrative record require this Court to determine whether the Second AFBCMR Decision — correcting Mr. Keltner's military records to reflect that he was removed from the TDRL with a final disability rating of ten percent as of August 31, 2016 — is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.

The parties no longer dispute that Mr. Keltner's PTSD was incurred in the line of duty. Second AFBCMR Decision at 15. Accordingly, the threshold issue is whether the Air Force — having corrected Mr. Keltner's record to reflect his placement on the TDRL as of January 22, 2016, with a disability rating of fifty percent — was *per se* required to retain him on that list for five years and then retire him with a disability rating of fifty percent. Pl. MJAR at 11. The Court answers that question in the negative and agrees with the government that the Board must place a veteran "in the situation he would have occupied if the wrong had not been committed." Def. MJAR at 23–24. The Court nevertheless concludes, based on the administrative record, the VASRD, and the IDES regulations, that the Board's decision to assign Mr. Keltner a final disability rating of only ten percent is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.

### A.    The AFBCMR May Make Retroactive Disability Determinations, but They Must Be Reasonable, Supported by the Administrative Record, and Consistent with the DES Statutory and Regulatory Regime

After the Board determined that Mr. Keltner incurred PTSD in the line of duty, the Board corrected his record to reflect that finding. Second AFBCMR Decision at 15. The Board also applied 38 C.F.R. § 4.129 to reflect that Mr. Keltner was placed on the TDRL with a fifty percent rating on January 22, 2016, the day after he was released from the Air Force. *Id.* (applying 38 C.F.R. § 4.129). Mr. Keltner does not contest these decisions. The Board, however, did not stop there. The Board proceeded to further "correct" Mr. Keltner's records to show that he was removed from the TDRL on August 31, 2016 — the date of his August 2016 VA C&P Examination, AR 1080 — with a final disability rating of just ten percent. *See* Second AFBCMR Decision at 15.

As explained *supra*, Mr. Keltner argues the Board erred in: (1) removing him from the TDRL, effective August 31, 2016; and (2) assigning him a ten percent disability rating.

In particular, Mr. Keltner maintains that the Air Force "erred by constructively removing [him] from the TDRL . . . without following its own removal procedures." Pl. MJAR at 14. He contends that all service members on the TDRL are entitled to periodic medical examinations to determine if their condition has changed, an opportunity for review by an FPEB, and the right to a full and fair hearing if the service member demands it. Pl. MJAR at 15–16 (citing 10 U.S.C. §§ 1202, 1210, 1214). Because the Air Force never afforded him these "procedural protections," and cannot go back in time to provide them, Mr. Keltner asserts the Air Force was required to retain him on the TDRL for the statutory maximum of five years and then retire him with a fifty percent disability rating. Pl. MJAR at 16–17.[45] In a nutshell, Mr. Keltner's argument is that the AFBCMR could correct his records to put him on the TDRL but could not retroactively remove him from the TDRL.

Mr. Keltner's argument does have some facial appeal to it. As described above, there are, in fact, only two ways to be removed from the TDRL pursuant to 10 U.S.C. § 1210: (1) if a medical examination "given at least once every 18 months," 10 U.S.C. § 1210(a), supports the determination that the "disability is of a permanent nature and stable," *id.* § 1210(c); or (2) if "the physical disability for which the member's name was carried on the [TDRL] still exists" at the end of five years (under the previous version of the statute), then the disability "shall be considered to be of a permanent nature and stable," *id.* § 1210(b). Mr. Keltner is correct that he didn't receive the required "periodic examination" pursuant to 10 U.S.C. § 1210(a). Pl. MJAR at 14–16. Thus, Mr. Keltner reasons, the only way for the Air Force to remove him from the TDRL is to "consider[]" his disability "to be of a permanent nature and stable" due to the passage of the five-year mark. 10 U.S.C. § 1210(b); *see also* Pl. MJAR at 16 ("The fact that it is now impossible for the Air Force to timely schedule a follow-up examination or to convene a new PEB does not excuse it from needing a legal basis to remove Mr. Keltner from the TDRL.").[46]

To support that position, Mr. Keltner primarily relies on *Cook v. United States*, 123 Fed. Cl. 277 (2015). Pl. MJAR at 16–17. In *Cook,* Judge Sweeney held that when the Army retroactively placed a veteran on the TDRL, it "triggered" the statutory and regulatory "prerequisites" that are required to remove a veteran from that list. *Cook v. United States,*

---

[45] Elsewhere, Plaintiff contends that he deserves the "opportunity to be heard," which might include a new follow-up examination or a new PEB. Pl. Reply at 1.

[46] Plaintiff similarly argues that because the Air Force did not schedule a "baseline" medical examination after placing him on the TDRL, the AFBCMR had nothing to measure against "to determine whether a change in evaluation is warranted." Pl. Reply at 13–14 (quoting 38 C.F.R. § 4.129). Of course, the Board cannot schedule a baseline appointment for seven years ago, but it does not follow that the Board must award Mr. Keltner a fifty percent disability rating. Indeed, the government arguably *did* establish a baseline when it gave Mr. Keltner a Post-Deployment Health Reassessment. AR 1033. As explained *infra,* the Board's role is to decide, based on the totality of the record before it, how to correct Mr. Keltner's records to remedy the Air Force's error.

123 Fed. Cl. at 307–08. Because the Army failed to both schedule a follow-up exam and convene a new PEB within the required timeframe, Judge Sweeney concluded that the Army did not have a "legal basis" to remove the veteran from the TDRL. *Id.* at 308. In other words, *Cook* concluded that the only lawful outcome was to retain the service member on the TDRL for "as long as was legally authorized." *Id.* Although Judge Sweeney recognized that the Army could not "go back in time" to schedule a follow-up exam or convene a timely PEB, that did not permit the Army to disregard the regulatory prerequisites for TDRL removal. *Id.* Ruling otherwise, *Cook* opined, "would reward the Army for its own errors." *Id.* Mr. Keltner asks this Court to follow *Cook* and conclude that, because the Air Force failed to schedule a follow-up exam and convene a timely PEB for Mr. Keltner, the Board had no "legal basis" to remove him from the TDRL as of August 2016. Pl. MJAR at 16 (citing *Cook*, 123 Fed. Cl. at 308).

The government, in contrast, urges this Court not to follow *Cook*, pointing to two contrary decisions, including one that expressly disagreed with *Cook*. Def. MJAR at 27–28 (discussing *Petri v. United States*, 104 Fed. Cl. 537 (2012), and *Coleman v. Wilson*, 2022 WL 966857 (W.D.N.C. Mar. 30, 2022)).

In *Petri*, this Court held that the Physical Disability Board of Review acted reasonably when it retroactively removed an Air Force veteran from the TDRL without either performing a new physical examination or an FPEB hearing. *See* 104 Fed. Cl. at 557–58.[47] According to *Petri*, a physical exam performed years after a veteran's separation would not reflect the state of a veteran's health at the time of his or her separation in any event, so a reasonable alternative is for a review board to consider contemporaneous, existing medical records instead. *Id.* *Petri* also drew an important distinction between placing members on the TDRL and "correct[ing] their records to reflect that they had been upon the TDRL." *Id.* at 557. The latter is a remedy for the military's error to effectuate benefits and payments; it is not a time machine that literally places the service member on the TDRL in the past and that retroactively requires the military to follow procedures it can no longer follow because of the passage of time.

In *Coleman*, the United States District Court for the Western District of North Carolina similarly held that the Air Force acted reasonably when it retroactively removed a veteran from the TDRL without scheduling a new physical exam. *Coleman*, 2022 WL 966857, at *6. The district court expressly disagreed with this Court's decision in *Cook* because it would lead to an arguably absurd result: by *Cook*'s logic, 38 C.F.R. § 4.129 requires either a "retroactive physical examination that is impossible to complete" in a

---

[47] The Physical Disability Board of Review is an alternative forum that was "established under 10 U.S.C. § 1554(a) . . . for the purpose of reassessing the combined disability ratings of service members discharged after September 11, 2001 as unfit for continued military service, who had a combined disability rating of [twenty percent] or less, and who were not eligible for retirement." *Petri*, 104 Fed. Cl. at 545.

timely manner or that everyone on the TDRL remains there until their disability graduates to become "legally permanent." *Id. Coleman* thus followed *Petri* instead. *Id.* at *7 ("The *Petri* court's reasoning is more persuasive.").

This Court agrees with *Petri* and the district court's decision in *Coleman*. Finding that the AFBCMR was required to retain Mr. Keltner on the TDRL for the statutory maximum of five years and *then* retire him with a disability rating of fifty percent would be inconsistent with the Correction Board's broad authority to correct military records whenever the "Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1); *see also Richey v. United States*, 322 F.3d 1317, 1323 (Fed. Cir. 2003) (explaining that military secretaries have "the power to correct military records using civilian Corrections Boards" (citing 10 U.S.C. § 1552(a)(1))); Def. MJAR at 23–24. Indeed, the Federal Circuit has explained that "the discretionary power granted to the Correction Boards by 10 U.S.C. § 1552 includes the power to backdate discharges where such backdating places the claimant *where he likely would have been absent the improper discharge*." *Barnick v. United States*, 591 F.3d 1372, 1380 (Fed. Cir. 2010) (emphasis added) (quoting *Denton v. United States*, 204 Ct. Cl. 188, 200 (1974)); *see also Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) ("The Secretary is obligated not only to properly determine the nature of any error or injustice, but also to take 'such corrective action as will appropriately and fully erase such error or compensate such injustice.'" (quoting *Caddington v. United States*, 147 Ct. Cl. 629, 632 (1959))); *Sawyer v. United States*, 930 F.2d 1577, 1581 (Fed. Cir. 1991) (explaining that BCMRs may make retroactive disability determinations).

In this case, the Board retroactively added Mr. Keltner to the TDRL to correct an injustice, but that does not mean the Board should give Mr. Keltner a windfall, either. *See McCord v. United States*, 943 F.3d 1354, 1358 (Fed. Cir. 2019) ("[I]t would make no sense for Congress to make a veteran whose disability record was later corrected better off than another whose record had no error in the first place."); *cf. Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005) (explaining that Congress did not intend a remedial statute to provide "a damage remedy [that] would provide [plaintiffs] nothing but a windfall"). In other words, the Board necessarily has the power not only to correct Mr. Keltner's records to give him relief, but to do so in a manner that places him in the position he would have occupied absent the improper discharge. *Barnick*, 591 F.3d at 1380 ("The Board is competent to make such a retroactive disability determination."). As *Petri* and *Coleman* correctly recognize, placing a veteran on the TDRL in real time, on the one hand, and *correcting the record to reflect* that he was on the TDRL for the purpose of crafting a remedy for the government's error, on the other hand, are two very different things. *Petri*, 104 Fed. Cl. at 557; *Coleman*, 2022 WL 966857, at *6–7.

The Board corrected Mr. Keltner's record to reflect that he was on the TDRL for the purpose of crafting a remedy. *See* Second AFBCMR Decision at 15. Because Mr. Keltner never *actually* went through the TDRL process, however, the procedural

requirements in 10 U.S.C. § 1210, 10 U.S.C. § 1214, and 38 C.F.R. § 4.129 were never triggered. *See* Pl. MJAR at 15–16 (arguing that a follow-up examination and a new PEB were "prerequisites" for retroactively removing him from the TDRL); *cf. Breland v. McDonough*, 22 F.4th 1347, 1352 (Fed. Cir. 2022) ("Simply put, the Veterans Court's interpretation is eminently reasonable because the agency cannot provide a six-month mandatory examination retrospectively.").

In sum, having erred by failing to place Mr. Keltner on the TDRL to begin with, the Air Force *ipso facto* could not have complied with the requisite procedures to remove him from the TDRL.  But that merely begs the question of what the AFBCMR (or this Court) should do to remedy the Air Force's error.  While the AFBCMR is empowered to make retroactive disability determinations generally, it still must follow the applicable IDES rules.  That brings the Court to the second issue in this case: whether the AFBCMR's determination that Mr. Keltner's PTSD warranted a final ten percent disability rating as of August 31, 2016, was arbitrary, capricious, contrary to law, or unsupported by substantial evidence.[48]

### B. The AFBCMR's Determination that Mr. Keltner Warranted a Disability Rating of Ten Percent was Arbitrary, Capricious, or Otherwise Contrary to Law

The Court concludes that the AFBCMR's latest decision, removing Mr. Keltner from the TDRL as of August 31, 2016, with a final disability rating of ten percent, is arbitrary, capricious, or contrary to law given the administrative record.  First, the AFBCMR misapplied the VASRD.  Second, to the extent that Mr. Keltner argues that there is an unexplained and irrational gulf between the Board's ten percent disability rating and the VA's fifty percent disability rating, the Court concurs.  At a minimum, the Board's failure to adequately consider the VA Rating Decision renders the Board's decision arbitrary and capricious.  *See* Second AFBCMR Decision at 14.  Third, the Board erred as a matter of law in not adopting the VA's almost contemporaneous disability rating of fifty percent.  AR 1072–73.  Finally, in the alternative, the AFBCMR erred in finding that Mr. Keltner's PTSD was permanent and stable as of August 31, 2016.

---

[48] During oral argument, Plaintiff appeared to acknowledge that the AFBCMR may retroactively remove a service member from the TDRL if the record supports that outcome. *See* Tr. at 25:16–20 ("[PLAINTIFF'S COUNSEL]: . . . Our argument is really that, in this case, if there was somewhere in the record evidence of a finding of permanency and stability, then *you could be removed from the TDRL prior to the expiration of the time period.*" (emphasis added)).

### 1. The AFBCMR's Misapplication of the VASRD Was, at a Minimum, Irrational

The AFBCMR's latest decision is critically flawed because it badly misreads the August 2016 VA C&P Examination in the context of the VASRD and improperly discounts the VA Rating Decision.  Either way, Mr. Keltner is entitled to judgment and the monetary relief he seeks.

The Board relied primarily on Mr. Keltner's August 2016 VA C&P Examination to determine that his condition warranted a final rating of ten percent.  Second AFBCMR Decision at 13 (explaining that "the Board finds the applicant's PTSD symptoms outlined in the VA C&P examiner's notes, dated 31 Aug 16, align with a [ten] percent disability rating").  The Board acknowledged the VA's nearly contemporaneous "final rating for [Mr. Keltner's] medical condition of, 'PTSD, to include depressive disorder, anxiety disorder, and alcohol use disorder,' was rated at 50 percent."  *Id.* at 14.  The Board disregarded the VA's rating, however, cryptically noting that it "cannot speculate why the VA assigned a 50 percent rating."  *Id.*

Section 1216a of Title 10 of the United States Code requires the military to utilize the VASRD in evaluating disabilities, "including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims."  10 U.S.C. § 1216a(1)(A); *see also* National Defense Authorization Act for Fiscal Year 2008 § 1612, 122 Stat. at 442 (explaining that Congress sought to "eliminate unacceptable discrepancies and improve consistency among disability ratings" between the VA and the military departments).  As explained above, a service member's final rating can determine if he or she is separated or retired — with significant financial implications.  *See* 10 U.S.C. § 1201(b).

The VA's "General Rating Formula for Mental Disorders" is contained within 38 C.F.R. § 4.130.  There are six disability levels: zero, ten, thirty, fifty, seventy, ninety, and one hundred percent.  38 C.F.R. § 4.130.  Relevant here, the definitions for ratings of ten, thirty, and fifty percent are as follows:

> [Ten percent:] Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or symptoms controlled by continuous medication.

> [Thirty percent:] Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior,

self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events).

[Fifty percent:] Occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.

38 C.F.R. § 4.130.

Determining which rating should be assigned to a veteran is a symptom-driven analysis. *See Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 116 (Fed. Cir. 2013) (explaining that "most of the General Rating Formula [for Mental Disorders] is dedicated to associating certain symptoms with certain disability ratings, and to this end, the regulation's plain language highlights its symptom-driven nature"); *Bankhead v. Shulkin*, 29 Vet. App. 10, 22 (2017) (requiring the VA to "engage in a holistic analysis in which it assesses the severity, frequency, and duration of the signs and symptoms of the veteran's service-connected mental disorder; quantifies the level of occupational and social impairment caused by those signs and symptoms; and assigns an evaluation that most nearly approximates that level of occupational and social impairment"). A veteran must also exhibit the required degree of "occupational and social impairment," which must be "due to" those symptoms. *Vazquez-Claudio*, 713 F.3d at 116.[49]

In assigning Mr. Keltner a final disability rating of ten percent based on the August 2016 VA C&P Examination, the Board did not address, or even acknowledge, that this VA exam is replete with contrary findings supporting a higher disability rating. The Board relied almost exclusively on the fact that the VA psychologist checked a box on the examination form describing "[o]ccupational and social impairment due to mild or

---

[49] The Federal Circuit also observes that the use of the phrase "such symptoms as" in all of the rating definitions greater than ten percent implies that these lists of symptoms are non-exhaustive. *See Vazquez-Claudio*, 713 F.3d at 115. Furthermore, as the disability rating levels increase, the associated levels of "occupational and social impairment" are more severe, as are the "frequency, severity, and duration" of associated symptoms. *Id.* at 116.

transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or[] symptoms controlled by medication," which is nearly the definition of a ten percent disability rating.  *Compare* 38 C.F.R. § 4.130, *with* AR 1081.[50]  But the Board's hyperfocus on the August 2016 VA C&P Examination report oddly ignores that the bulk of those exam notes do not describe someone with merely "mild or transient symptoms."  *Compare* 38 C.F.R. § 4.130 (ten percent rating), *with* AR 1080 (describing Mr. Keltner as exhibiting "mild to *moderate* symptoms overall" (emphasis added)).

Indeed, the examining psychologist indicated that Mr. Keltner's anxiety and depressive disorders could not be disentangled from his PTSD.  AR 1080–81.  The August 2016 VA C&P Examination further indicates that Mr. Keltner had the following symptoms: depressed mood; anxiety; panic attacks more than once a week; chronic sleep impairment; mild memory loss (such as forgetting names, directions, or recent events); disturbances of motivation and mood; and even suicidal ideation.  AR 1094.  Cross-checking Mr. Keltner's symptoms with the VASRD ratings demonstrates that Mr. Keltner exhibited *every* symptom enumerated in the thirty percent disability rating.[51]  *Compare* AR 1094, *with* 38 C.F.R. § 4.130.  Mr. Keltner further displayed two symptoms that are encompassed in the fifty percent rating — *i.e.*, disturbances of motivation and mood, and panic attacks more than once a week; he reported having panic attacks at least once per *day*.  *Compare* AR 1090, 1094, *with* 38 C.F.R. § 4.130.  Finally, he had one significant symptom consistent with a seventy percent disability rating: suicidal ideation.  *Compare* AR 1094, *with* 38 C.F.R. § 4.130.  Although Mr. Keltner denied "current suicidal ideation," the VA psychologist confirmed "passive suicidal ideation" about once a month, including during the week before the examination.  AR 1091.

Because a disability rating determination must be a "symptom-driven" analysis, *Vazquez-Claudio*, 713 F.3d at 116, the Court, as discussed in more detail below, finds that the VA's assignment of a fifty percent disability rating was eminently reasonable, AR 1072–73, whereas the Board's ten percent rating was not, Second AFBCMR Decision at 15.

---

[50] The only difference in wording between the August 2016 VA C&P Examination form and 38 C.F.R. § 4.130 is the word "continuous."  Whereas the August 2016 VA C&P Examination form provides "symptoms controlled by medication," AR 1081, the definition of a ten percent disability rating provides "symptoms controlled by *continuous* medication," 38 C.F.R. § 4.130 (emphasis added).  This distinction appears insignificant as neither party addresses it.  This Court concurs with the Board that the August 2016 VA C&P Examination form references the ten percent rating definition in 38 C.F.R. § 4.130.  *See* Second AFBCMR Decision at 14.

[51] The examiner also noted that Mr. Keltner displayed "suspiciousness" as well, relaying fears of "bombs going off, explosions, or dying"; hypervigilance; and heightened feelings of fear when driving.  AR 1090.

In reviewing the Board's determination, the Court must consider Mr. Keltner's level of social and occupational impairment in addition to his symptoms. *See* 38 C.F.R. § 4.130; *Vazquez-Claudio*, 713 F.3d at 117–18 (explaining that, for any particular disability rating level, a veteran must exhibit the required degree of "occupational and social impairment," which, in turn, must be "due to" the disability symptoms). The August 2016 VA C&P Examination documented these issues in detail. AR 1090. For example, Mr. Keltner reported that, during social interactions, he experienced considerable anxiety, including "physical tension along with sweating, feeling like his eyes get red, stammering, stuttering, and lapses in concentration in the middle of conversations." *Id.* He also had "feelings of detachment or estrangement from others." AR 1093. Mr. Keltner's depression contributed to social impairment as well. He had lost interest in social activities he previously enjoyed, like playing pool and darts. AR 1090. He said he had two close friends that lived nearby, "estimated that he ha[d] contact with friends anywhere from daily to a couple times per year," "denied that that he and his friends go out and do things together," and "reported that he spends his free time watching television." AR 1083.

The August 2016 VA C&P Examination further conveys that Mr. Keltner's PTSD and "overlapping" anxiety, depressive, and alcohol use disorders contributed to occupational impairments as well. *See* AR 1080–81. Although the record evidence for that conclusion is more ambiguous than that of his social impairment, the exam notes substantiate that Mr. Keltner experienced reduced occupational "efficiency," "productivity," and "reliability," the relevant metrics from the VASRD criteria. *See* 38 C.F.R. § 4.130 (describing occupational impairment in terms of "reduced" or "decrease[d]" "efficiency," "productivity," and "reliability"). Although he denied "significant work-related adjustment problems," he reported having problems concentrating, and said he would forget conversations and other information. AR 1084, 1090, 1094. He also said he had low energy, felt "tired a lot," and was "down and depressed on a daily basis for most of the day." AR 1090, 1094. His alcohol use disorder had led to a DUI and work tardiness. AR 1091. His social anxiety and panic attacks clearly hindered his work relationships, as he described feeling uncomfortable around others, especially in crowds or when speaking to someone in professional roles. AR 1083. And the VA psychologist noted that Mr. Keltner satisfied PTSD criteria such as "recurrent, involuntary, and intrusive distressing memories"; "persistent and exaggerated negative beliefs or expectations about oneself, others, or the world"; and "irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects." AR 1093–94.

Despite this torrent of evidence pointing toward a higher disability rating, the AFBCMR found that Mr. Keltner's condition warranted a rating of just ten percent. Second AFBCMR Decision at 15. In so doing, the Board "entirely failed to consider an important aspect of the problem." *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).   Although "symptomology should be the fact finder's primary focus when deciding entitlement to a given disability rating," *Vazquez-Claudio*, 713 F.3d at 117, the Board ignored that Mr. Keltner exhibited *every* symptom for a rating of thirty percent, that he had two symptoms in line with a fifty percent rating, and that he had one symptom in line with a seventy percent rating, *see* Second AFBCMR Decision at 14; AR 1094.

The Board decision opined that "[t]he VA C&P examiner's notes do not indicate the applicant meets the criteria for [a thirty] percent rating.   In fact, the examiner's assessment indicated, 'the applicant's symptoms are in better control and he is functioning consistently well.   I will continue current medications.'"   Second AFBCMR Decision at 14 (quoting AR 1089).   But that summation can only be achieved by cherry-picking the record.   *See Valles-Prieto v. United States*, 159 Fed. Cl. 611, 618 (2022) ("The AFBCMR also failed to consider the entire record because it cherry-picked which evidence to consider.").   Indeed, the VA psychologist noted that Mr. Keltner had *all* of the symptoms listed in the thirty percent definition.   *Compare* AR 1094, *with* 38 C.F.R. § 4.130.   Furthermore, the Board's quotation about Mr. Keltner's symptoms being in "better control" does not come from the August 2016 VA C&P Examination, as the Board suggests, but from an earlier exam with a different doctor.   *See* AR 1089–90 (incorporating notes from two previous exams by two different health professionals).

In addition to disregarding Mr. Keltner's panoply of symptoms the VA psychologist documented in the August 2016 VA C&P Examination, the Second AFBCMR Decision similarly ignored the VASRD criteria for occupational and social impairment.   Instead of discussing the examiner's descriptions of Mr. Keltner's impaired work and social life, the Board found, in essence, that the VA examiner "summarized" his findings by checking the ten percent VASRD rating box.   Second AFBCMR Decision at 14.   That evidence is insufficient to support a ten percent rating when the rest of the examination notes, which the Board did not even address, contradict the checkbox.   The Court's conclusion, in that regard, is consistent with the government's concession that "[t]here is no clear bright line between a 10 percent rating and a 30 percent rating or 50 percent rating under VASRD section 4.130" but "instead, the regulation supplies general descriptions to guide the rating decision."   Def. MJAR at 34.

## 2.   The AFBCMR Improperly Discounted the VA Rating Decision

The VA Rating Decision that evaluated Mr. Keltner's PTSD as a fifty percent disability did not make the same error as the Board, which entirely discounted the VA Rating Decision because it could not "speculate why the VA assigned [Mr. Keltner] a fifty percent rating."   Second AFBCMR Decision at 14.   But no speculation is necessary.   After all, the VA explained that it reached its disability rating determination by considering the "overall evidentiary record."   AR 1074.   The VA Rating Decision noted that Mr. Keltner was reported to have "mild or transient symptoms" consistent with a ten percent rating,

but then it *also* noted that he presented with a "depressed mood, suicidal ideation, disturbances of motivation and mood, mild memory loss, anxiety, chronic sleep impairment, and panic attacks more than once a week." *Id.* The AFBCMR, however, myopically focused only on the fact that the VA psychologist checked the ten percent box on the August 2016 VA C&P Examination form. Second AFBCMR Decision at 14. In enacting 10 U.S.C. § 1216a, Congress sought to "eliminate unacceptable discrepancies and improve consistency among disability ratings" between the VA and the military departments. National Defense Authorization Act for Fiscal Year 2008 § 1612, 122 Stat. at 442. On this record, the chasm between the AFBCMR's ten percent disability rating and the VA's fifty percent disability rating is "unacceptable." *Id.* And, on this record, the AFBCMR's determination is arbitrary and capricious, while the VA's rating is reasonable.

The AFBCMR's further reliance upon the September 2021 AFRBA Memorandum does not excuse ignoring the VA Rating Decision. The Board's psychological advisor — whose role was limited to reviewing Mr. Keltner's medical records — wrote that Mr. Keltner "was able to function as he was able to maintain full-time employment and even worked over time on multiple occasions and simultaneously attended Heating, Ventilation, and Air Conditioning (HVAC) schooling. There were no significant impairments noted with his occupational, social, and academic functioning." Second AFBCMR Decision at 11 (summarizing the September 2021 AFRBA Memorandum, AR 1051). The AFRBA Memorandum, in turn, is a woefully incorrect summary of the August 2016 VA C&P Examination. *See* AR 1094. The August 2016 VA C&P Examination explained that Mr. Keltner's PTSD "causes *clinically significant* distress or impairment in social, occupational, or other important areas of functioning." *Id.* (emphasis added). The Board did not address the VA's observation or how the AFRBA Memorandum diverged from it. The Board's psychological advisor also failed to appreciate that "occupational impairment" refers to decreases in "efficiency," "reliability," "productivity," and the "ability to perform occupational tasks." *See* 38 C.F.R. § 4.130. Concluding that the inquiry is over if a veteran holds a fulltime job would render the symptoms and impairment language in the ratings meaningless. *See id.*

The Board's decision is not entitled to greater deference simply because an expert trained in psychology selects a few facts in the record while ignoring the rest. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (explaining that if an agency's explanation for a decision "runs counter to the evidence before the agency," then the decision is arbitrary and capricious); *Versaci v. United States,* 403 F.2d 246, 258 (Ct. Cl. 1968) (concluding that medical advice "'couched in broad conclusions rather than a reasoned discussion of the evidence' is entitled to little weight" (quoting *Dayley v. United States,* 180 Ct. Cl. 1136, 1146 (1967)); *Brown,* 396 F.2d at 995 n.15 ("This court has never held that a board's action is arbitrary merely because it relied on an *ex parte* statement from The Surgeon General. If, however, the statement was inaccurate and the board relied on it, we have declined to uphold the denial of relief." (citation omitted)).

The Second AFBCMR Decision itself further acknowledges that Mr. Keltner should receive "liberal consideration due to his mental health conditions and in accordance with the Secretary of Defense Clarifying Guidance memorandums, dated 3 Sep 14 and 25 Aug 17."  Second AFBCMR Decision at 6; *cf. Doyon*, 58 F.4th at 1238 (elaborating on these two memorandums and concluding that they are binding on BCMRs); Rebecca Izzo, Comment, *In Need of Correction: How the Army Board for Correction of Military Records Is Failing Veterans with PTSD*, 123 Yale L.J. 1587, 1590 (2014) (arguing that the military "is still not appropriately diagnosing PTSD," despite significant advances in medical understanding over the last several decades).  There is no indication in the Board's decision, however, that it gave Mr. Keltner any benefit of the doubt, despite:  (1) the government's acknowledgement that the record could support a higher disability rating percentage; and (2) the VA Rating Decision's assessing a fifty percent disability rating.[52]

In sum, the Board failed to "articulate any rational connection between the facts found and the choice made."  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  Its determination that Mr. Keltner warranted a ten percent disability rating as of August 2016 was arbitrary and capricious.

### 3.   The AFBCMR was Required to Follow the VA Rating Decision

Plaintiff argues that the Air Force's determination of ten percent — after the VA's determination of fifty percent — violated the "presumption of regularity" that should have been accorded to the VA's rating.  Am. Compl. (Count III); Pl. Reply at 21.  This contention misunderstands the doctrine.   According to the Federal Circuit, the "presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties." *Toomer v. McDonald*, 783 F.3d 1229, 1235 (Fed. Cir. 2015) (citing *Sickels v. Shinseki*, 643 F.3d 1362, 1366 (Fed. Cir. 2011)).  Although the Court will presume that the VA properly discharged its duties when it rated Mr. Keltner's disability at fifty percent, this presumption, standing alone, does not mean that the Air Force was required to assign him an identical rating.  *See Toomer*, 783 F.3d at 1235.  An agency does not "violate" this presumption, Pl. MJAR at 24, when it reaches a different conclusion than another agency.

Nevertheless, this Court agrees with Mr. Keltner that "[t]he Government's approach does not place Mr. Keltner in the situation he would have occupied but for the Air Force's mistakes."  Pl. Reply at 9.[53]  The Board in this case simply failed to fully comprehend or consider the "but-for world."  *Spicer v. McDonough*, 61 F.4th 1360, 1365–

---

[52] The government agrees that Mr. Keltner had "two symptoms . . . for the 50% disability rating" and one symptom "that meets the 70% disability rating."  Def. MJAR at 36.

[53] The government agrees with Mr. Keltner's framing: "The question for the board was, save for the Air Force's error, what position would Mr. Keltner be in *today*."  Def. Reply at 3.

66 (Fed. Cir. 2023) (rejecting the "the government's concerns that the VA cannot 'measure, evaluate, or appropriately compensate' [a veteran] . . . in a but-for world because the assessment is too speculative," because "[d]escribing a but-for world necessarily requires imagining that which did not occur" and "some speculation is naturally baked into but-for causation.").

In particular, the Board incorrectly assumed that it was free to arrive at a disability rating itself, *de novo*, without regard to the VA's rating:

> [T]he Air Force may assign disability ratings independently for TDRL re-evaluations by consideration of the VA and[/or] civilian medical records along with the results of the TDRL re-evaluation[,] and is not bound by the VA's determination as is required when a service member enters the MEB for separation, under the IDES.

Second AFBCMR Decision at 14. The Board cited no authority for this assertion, but its view appears to be derived directly from the AFBCMR psychological advisor's opinion in the September 2021 AFRBA Memorandum. AR 1051. There, the psychological advisor asserted (also without citing any authority):

> It is acknowledged the applicant was given a 50% disability rating from the VA from the same C&P exam despite the C&P exam evaluator determining the level of impairment that exactly fits and meets the 10% criteria. To explain the disparity and for general awareness, when a service member enters the [MEB] for separation, under the [IDES], the VA is the single rating authority and the [DoD] to include the Air Force must accept the VA rating for the unfitting condition. Nonetheless during the TDRL re-evaluation and adjudication process, DoD is not bounded by the VA's rating and makes its decision independently considering the VA and/or civilian medical records and the results of the TDRL re-evaluation if available.

AR 1051 (emphasis in original).

What both the psychological advisor and the Board got right is that, in the "but-for world," Mr. Keltner would have been processed through the IDES. *See* Second AFBCMR Decision at 14; AR 1050–51 (noting that Mr. Keltner "should have been processed through the DES/IDES for a medical discharge"). The Board's psychological

advisor also correctly explained what would have happened if Mr. Keltner had "be[en] properly processed through the DES":

> [T]he IPEB would find his condition of PTSD, VARSD code 9411 as unfitting, designated as Combat Related and would recommend he be placed on the [TDRL] with a rating of 50% because his condition [would] not [be] determined as stable in accordance to AFI 36-3212.  He would also be required to receive a TDRL re-evaluation once every 18 months for up to three years or until his condition was determined to be stable by a duly qualified psychiatrist or doctoral level psychologist. If his condition was determine[d] to be stable, he would be removed from TDRL and be given another and final rating (the rating could remain the same, increase or decrease depending on level of impairment) from the Air Force.

AR 1050.[54]

The defect in the psychological advisor's conclusion, however — and thus in the Board's conclusion — is failing to appreciate that, but for the Air Force's error, the Air Force would have had to follow the VA's disability rating as part of the IDES.  DoDM 1332.18, § 10.4 ("TDRL Reevaluation").  Indeed, that is the entire point of the IDES:  the VA performs the medical exam and decides the rating, and the military decides whether the disability renders the service member unfit.  *Id.*; *see also Kaster*, 158 Fed. Cl. at 90 n.2 ("[T]he [IDES] [is] a joint medical evaluation process which combines the disability examinations performed by DoD and the VA and requires the DoD to apply the VA's disability rating determinations for all conditions the Navy determines to be unfitting."); U.S. Gov't Accountability Off., GAO-12-676, *Military Disability System: Improved Monitoring Needed to Better Track and Manage Performance* 3 (2012) (describing the IDES and explaining that during the "PEB phase" the VA "prepares a rating that covers the conditions that DOD determined made a servicemember unfit for duty" and that "[t]his rating is prepared for use by both agencies in determining disability benefits"); U.S. Gov't Accountability Off., GAO-13-5, *Recovering Servicemembers and Veterans: Sustained Leadership Attention and Systematic Oversight Needed to Resolve Persistent Problems Affecting Care and Benefits* 10 (2012) ("IDES merges DOD's and VA's separate medical exams for servicemembers into a single exam process" and "consolidates DOD's and VA's separate disability rating decisions into a single VA rating decision[.]"); Dep't of Def., *IDES*, https://warriorcare.dodlive.mil/Portals/113/Documents/Reference%20Center/IDES-New-Factsheet.pdf (last visited May 2, 2023) ("The IDES is a joint DoD and [VA] disability

---

[54] The psychological advisor erroneously referenced the current three-year TDRL maximum; the correct time period for the purposes of this case, however, is five years, not three years, as the Court noted above.

evaluation process.  Under this system, . . . [s]ervice members determined to be unfit for duty receive a single set of disability ratings to determine the appropriate level of DoD and VA disability benefits . . . .VA assigns disability ratings according to the [VASRD] that are accepted by both DoD and VA.").[55]

Air Force sources are similarly consistent in explaining that the VA determines the disability ratings as part of the IDES process:

> The VA will perform a medical exam which will be used by the Air Force in determining your fitness for duty and by the VA in determining your disability ratings. The PEB will decide which condition(s) (if any) makes you unfit for continued service and will send the case file to the VA, who will assign your disability ratings. The PEB will then apply the VA ratings to your unfitting conditions.

---

[55] *See also* Dept of Def., *Report to the Congressional Committees: Assessment and Recommendations Report: Consolidation of the Disability Evaluation System* § 1.1 (Nov. 2014) ("IDES streamlines the disability process so Service members receive a single set of physical disability examinations.  The examinations are conducted according to VA protocols and disability ratings prepared by VA. DoD and VA share the examination results and ratings to relieve Service members of the burden of redundant examination requirements and divergent ratings for the same disability."); *Seamless Transition: Review of the Integrated Disability Evaluation System Before the S. Comm. on Veterans' Affs.*, 112th Cong. 54 (2012) (statement of John R. Gingrich, Chief of Staff, United States Department of Veterans Affairs) ("In contrast to the DES legacy process, IDES provides a single set of disability examinations and a single-source disability rating, for use by both Departments in executing their respective responsibilities."); *id.* at 10 (statement of Dr. Jo Ann Rooney, Acting Under Secretary of Defense, Personnel and Readiness, United States Department of Defense) ("The IDES, similar to the DES Pilot, streamlines the disability process so Servicemembers receive a single set of physical disability examinations conducted according to VA examination protocols and disability ratings prepared by VA.  The Departments of Defense and Veterans Affairs share the examination results and ratings to relieve Servicemembers of the burden of redundant examination requirements and divergent ratings for the same disability."); *Legislative Hearing on Pre-Discharge Claims Programs: Are VA and DOD Effectively Serving Separating Military Personnel Before the Subcomm. on Disability Assistance & Mem'l Affs. of the H. Comm. on Veterans' Affs.*, 115th Cong. 24 (2017) (statement of Willie C. Clark, Sr., Deputy Under Secretary for Field  Operations, Veterans Benefits Administration, United States Department of Veterans Affairs) ("IDES provides a single set of disability examinations and a single-source disability rating that are used by both departments in executing their respective responsibilities — eliminating the duplicate medical examination and rating determinations within DoD and within VA processes.").

U.S. Air Force, *Integrated Disability Evaluation System, Air Force Wounded Warrior (AFW2) Program*;[56] *see Air Force Manual 41-210*, at 208–09 (Sept. 10, 2019) ("The [IDES] integrates the [DES] with the [VA], and delivers the advantage of *single-sourced disability ratings* that are accepted by both the DoD and the VA[.]" (emphasis added)).[57]

Thus, under the IDES, the final, total disability rating of a military service may differ from the VA's, not because the military issues its own rating in lieu of the VA's rating, but rather because the military only compensates members for those disabilities which render the member "unfit for further military service."[58]

But perhaps the TDRL process is different and exempt from the normal VA rating process, even under the IDES, as the psychological advisor and the Board seem to posit. AFI 36-3212 suggests that possibility, in providing that "[t]he *PEB* will assign a disability rating percentage(s) to unfitting medical conditions using the current VASRD for service members . . . *for TDRL reevaluations*." AFI 36-3212 ¶ 1.10.2 (emphasis added). The problems for the Air Force here, however, are several.

*First*, that same paragraph of the AFI has a benefit-of-the-doubt rule that applies to Mr. Keltner's case. *See id.* ("When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the service member."). Here, the Board does not explain why it entirely disregarded the VA's rating and assigned a vastly lower rating years later,

---

[56] As of May 2, 2023, this website was available at: https://www.woundedwarrior.af.mil/About /Documents/Display/Article/940713/integrated-disability-evaluation-system.

[57] *See also* Air Force Pers. Ctr., *Integrated Disability Evaluation System (IDES)*, https://www .woundedwarrior.af.mil/Portals/23/documents/07_PROGRAMS%20AND%20INITIATIVES /02_Caregiver%20Support/IDES%20Short%20Brief.pdf (last visited May 2, 2023) (presentation on IDES, indicating that the Air Force will "[a]pply ratings from VA for unfitting conditions"); U.S. Air Force, *USAF Integrated Disability Evaluation System Fact Sheet* 1 (2015), https://www .woundedwarrior.af.mil/portals/23/documents/082916_ides_factsheetfeb2015.pdf ("The VA will perform a medical exam which will be used by the Air Force in determining your fitness for duty and by the VA in determining your disability ratings. The PEB will decide which condition(s) (if any) makes you unfit for continued service and will send the case file to the VA, who will assign your disability ratings. *The PEB will then apply the VA rating to your unfitting conditions*." (emphasis added)).

[58] U.S. Air Force, *Integrated Disability Evaluation System, supra* note 57 ("The findings of the two agencies frequently differ because the VA may compensate for any service-connected physical or mental condition listed in the VASRD, whereas the Air Force may only compensate for those conditions which render you unfit for further military service. *For this reason*, it is not unusual for the military and VA total disability ratings to differ." (emphasis added)); *see also* U.S. Air Force, *USAF Integrated Disability Evaluation System Fact Sheet, supra* note 57, at 9 (same).

instead.   At a minimum, the VA's fifty percent rating should have created *at least* a reasonable doubt in favor of Mr. Keltner pursuant to the Air Force's own regulation.[59]

*Second*, AFI 36-3212 ¶ 1.10.2 must be read in conjunction with both ¶ 8.5.1 of the same document and DoDM 1332.18, Vol. 1.   The former provides that the Air Force, as part of the TDRL reevaluation process, "queries the VA for the most current rating within 16 months from placement on TDRL," AFI 36-3212, ¶ 8.5.1, and "[i]f the VA rating is sufficient for adjudication, the TDRL office will forward to the [IPEB] for review," *id.* ¶ 8.5.1.1.   The latter describes the TDRL reevaluation procedure:

> VA will conduct and prepare rating *decisions* for veterans who were temporarily retired for disability in accordance with VA laws and regulations.   VA will provide a copy of the most current rating and the medical evidence upon which the most current rating is based . . . .   *If* VA does *not* provide examination and rating information sufficient to adjudicate the veteran's case or if the VA exam is older than 18 months, the Military Department will execute required TDRL examinations and ratings in accordance with [the VASRD].

DoDM 1332.18, ¶ 10.4 ("TDRL Reevaluation") (emphasis added); *see also* DoDM 1332.18, Vol. 2, at 36 (Aug. 21, 2020) (Enclosure 5, "TDRL Procedures").   An Air Force Instruction cannot override a DoD regulation.   *Baude v. United States*, 955 F.3d 1290, 1299 (Fed. Cir. 2020) (concluding that the Secretary of the Air Force "did not have discretion to change the DoD-imposed regulatory requirement" and that he "was obligated to follow [the] DoDI").   Accordingly, in assessing the "but-for world," the AFBCMR must adhere to the VA's rating, even for a service member on the TDRL, unless there is some reason to conclude that the VA's "examination and rating information" was insufficient.   DoDM 1332.18, ¶ 10.4

In Mr. Keltner's case, neither the Board nor its psychological advisor determined that the VA's "examination and rating information" was insufficient or somehow

---

[59] Plaintiff claims that if there was a reasonable doubt over the degree of his disability, then the Board failed to resolve the doubt in his favor.   Am. Compl. at 13 (Count II) (citing 10 U.S.C. § 1216a; 38 C.F.R. § 4.3).   This Court agrees, but because the Court finds that a ten percent rating as of August 2016 was unreasonable based on the record, there was not an "approximate balance" of evidence straddling two different possible ratings.   *See Lynch v. McDonough*, 21 F.4th 776, 781 (Fed. Cir. 2021) (explaining that reasonable doubt exists when there is an "approximate balance" of positive and negative evidence); *see also* 38 C.F.R. § 4.7 ("Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating.   Otherwise, the lower rating will be assigned.").   In other words, Mr. Keltner does not need this tie-breaker rule to prevail.

defective.  DoDM 1332.18, ¶ 10.4.  Rather, both the Board and its psychological advisor relied on the August 2016 VA C&P Examination and then simply assumed they could disregard the VA's nearly contemporaneous fifty percent disability rating.  This approach failed to recognize that, as part of the IDES, the Air Force ordinarily must adhere to the VA's disability rating.[60]

Moreover, at least the Board's psychological advisor candidly explained that she was basing her ten percent recommendation "upon the evidence presented and available at the 'snapshot' time of the records *following 18 months* of his discharge *in lieu of an official TDRL assessment*."  AR 1051 (emphasis added).  That is, she acknowledged that a *de novo* rating determination does not itself constitute a TDRL reevaluation, which, given the timing, is now impossible to provide.  *See* AR 1050 ("Since the applicant never received a TRDL re-evaluation and it would not be possible for him to receive one in present time due to statutory limits, this psychological advisor utilizes his VA treatment records to determine his final rating.").[61]  In contrast, the Board merely assumed, without supporting authority, that its new disability rating *itself* constituted a proper TDRL re-evaluation.  Second AFBCMR Decision at 10 (noting that "the Air Force may assign disability ratings independently for TDRL re-evaluations").  But while this Court agrees with the government that the AFBCMR may correct Mr. Keltner's record retroactively to account for the "but-for world," Def. MJAR at 23–24, its latest decision is not, itself, a TDRL reevaluation, which would include a host of other procedural protections, including a new medical examination.  *See, e.g.*, AFI 36-3212, ¶ 8.11.  At least on this record, then, this Court concludes that the Board was required to follow the VA Rating Decision, which immediately followed the August 2016 VA C&P Examination.  *See Barnick*, 591 F.3d at 1381 ("[T]he extent of a service member's disability is to be determined at the time that he is found unfit for duty and separated from the service.").

---

[60] This Court rejects the government's attempt to minimize the importance of the VA's disability ratings in the IDES context, generally, and in the factual context of this case, in particular.  *See* Def. MJAR at 16 n.7 (citing *Schmidt v. Spencer*, 319 F. Supp. 3d 386 (D.D.C. 2018); *Ward v. United States*, 133 Fed. Cl. 418 (2017); and *Stine v. United States*, 92 Fed. Cl. 776 (2010)).  None of these cases addressed the IDES.  Moreover, in *Ward*, Judge Williams merely concluded that "the relevant time for a determination of whether Plaintiff is entitled to military disability benefits is when Plaintiff was separated from the service."  133 Fed. Cl. at 431 (citing *Stine*, 92 Fed. Cl. at 795).  The undersigned takes no issue with that uncontroversial principle, but here the VA's disability rating of Mr. Keltner was virtually contemporaneous with — and, indeed, was based on — the very same August 2016 VA C&P Examination that the AFBCMR used to issue a different (and lower) disability rating.

[61] The Board's psychological advisor expressly used Mr. Keltner's treatment records, but not the VA's rating, "to substitute [for] the absence of officially being on TDRL and receiving a TDRL re-evaluation."  AR 1050.

Finally, the lack of deference the AFBCMR paid to the VA Rating Decision is also inconsistent with this Court's remand order. *See* ECF No. 51 (remanding "this case to the AFBCMR for further proceedings consistent with the parties' agreement as incorporated by reference herein"). In particular, the government committed to the following: "[w]ith respect to the disability rating issue, on remand, if Mr. Keltner submits to the Board a rating decision by the [VA], the Board shall consider it, and the Board shall explain how it weighed evidence of . . . the VA's rating decision." ECF No. 50 at 5 (¶ 7). Furthermore, the Board acknowledged that, on remand, it was required "to consider the rating decision by the [VA] . . . and explain how it weighed evidence of the VA's rating decision." Second AFBCMR Decision at 9. The Board clearly did not do so; its mere mention of the VA Rating Decision and assertion that the Board could not "speculate why the VA assigned a 50 percent rating," *id.* at 14, does not remotely cut the mustard. *Beckham*, 392 F.2d at 622–23 ("A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing (as here), is inimical to a rational system of administrative determination and ultimately inadequate.").

### 4.   In the Alternative, the Air Force's Implicit Finding that Mr. Keltner's Condition was Permanent and Stable as of August 2016 was Arbitrary and Capricious

A determination that a service member's disability "is of a permanent nature and stable" is required for a member to be separated or retired. 10 U.S.C. §§ 1201(b)(1), 1203(b)(3). This includes when a member is removed from the TDRL. 10 U.S.C. § 1210(c)–(e); *Cronin*, 765 F.3d at 1336. Indeed, the reason a service member is placed on the TDRL in the first place is that the "disability is not determined to be of a permanent nature and stable." 10 U.S.C. § 1202; *see also Kaster*, 158 Fed. Cl. at 93 ("Placement on the TDRL is appropriate if the unfitting condition 'is not determined to be of a permanent nature and stable.'" (citing 10 U.S.C. § 1202)). The rationale, as explained *supra*, is to protect the government from having to pay for a disability that ultimately stabilizes at a lower rating, and to protect service members from being undercompensated for disabilities that wind up being more debilitating with time.

This requirement applies to BCMRs when performing retroactive disability determinations as well. *See* 10 U.S.C. §§ 1201(b)(1), 1203(b)(3). Indeed, a finding of permanency and stability is necessary to place a member in the position he or she would have been in, but for the military's error. *See* 10 U.S.C. § 1552(a)(1); *Barnick*, 591 F.3d at 1380 ("[T]he discretionary power granted to the Correction Boards by 10 U.S.C. § 1552 includes the power to backdate discharges where such backdating places the claimant *where he likely would have been absent the improper discharge*." (emphasis added and citations omitted)); *Roth*, 378 F.3d at 1381 ("The Secretary is obligated not only to properly determine the nature of any error or injustice, but also to take such corrective action as will appropriately and fully erase such error or compensate such injustice." (citations and quotations omitted)). Unlike mandatory procedures not carried out in their prescribed

timeframe — like scheduling a physical examination or convening a PEB — the Board can, and must, make a finding of permanency and stability retroactively (as of a specific date) so long as there is support in the record. The Board must examine the veteran's medical records and determine when the disability was no longer fluctuating enough to change his rating percentage. *Cf.* AFI 36-3212, ¶ 3.17.3. To complete this essential step and to identify a disability as stable, the Board must find that "the preponderance of medical evidence indicates the severity of the condition will probably not change enough within the next [five] years to increase or decrease the disability rating percentage." *Id.* (altered to reflect the prior statutory language applicable in this case). In Mr. Keltner's case, neither the AFRBA psychological advisor nor the AFBCMR recited or applied this standard to reach a conclusion.

Both parties agree that for the Air Force to have constructively removed Mr. Keltner from the TDRL on August 31, 2016, the Board had to determine that his PTSD condition was stable as of that date. Pl. MJAR at 13; Def. MJAR at 31. The government seems to argue that it *did* make this finding, at least implicitly, and that the "[B]oard's decision was amply supported by substantial evidence in the record." Def. MJAR at 33. This Court disagrees.

The Second AFBCMR Decision did not explain either why the Board retroactively removed Mr. Keltner on August 31, 2016, or when his condition had stabilized. *See* Second AFBCMR Decision at 13–14. To be clear, *the Second AFBCMR Decision makes no express stability finding whatsoever*. The only mention of Mr. Keltner's condition having "stabilized" comes from the Board's psychological advisor, but she does not explain *when* Mr. Keltner's condition had stabilized, and her account *skips* the actual findings from the August 2016 VA C&P Examination. Second AFBCMR Decision at 11 (summarizing the 2021 AFRBA Memorandum, AR 1050–51).

Nor do the government's briefs support that the Board found Mr. Keltner's condition to be permanent and stable as of August 31, 2016. The government only explains that "[b]ecause the closest and most comprehensive examination before the board was the August 2016 VA [C&P Examination], the board relied on that examination as the date that Mr. Keltner should have been removed from the TDRL." Def. MJAR. at 33. In other words, the government admits that the Board just used the closest thing on hand to determine Mr. Keltner's final rating, and then assumed *that* date represents the date on which Mr. Keltner's disability stabilized.

But even if the Court assumes the Board implicitly made a stability finding, it is unsupported by the record evidence. Mr. Keltner's medical records show that his condition worsened from June 2016 to August 2016. In June 2016, Mr. Keltner's psychiatrist wrote that Mr. Keltner "is not depressed now and is less anxious and not as pressured," but by August 2016, his anxiety and depressive symptoms were much more severe. *Compare* AR 1087, *with* AR 1090. Then, according to the September 2021 AFRBA

Memorandum, his condition had improved by early 2017.   AR 1051.   But the psychological advisor's medical chronology skipped over the crucial August 2016 VA C&P Examination and there are no underlying 2017 exam notes in the administrative record.[62]   Furthermore, the psychological advisor's conclusion that Mr. Keltner's condition had stabilized in August 2016 contradicts itself insofar as she opined that "his condition *had improved or was stable*."   *Id.* (emphasis added).   Improvement is antithetical to stabilization.   Indeed, the entire point of the TDRL is that disability conditions (and particularly PTSD) may fluctuate with time.   The fact that his condition may have improved in some narrow period is fundamentally inconsistent with a finding of stability.   Finally, the August 2016 VA C&P Examination itself contained no indications that Mr. Keltner's condition had stabilized, and neither did the VA Rating Decision.   *See* AR 1072–78, 1080–96.

The Second AFBCMR Decision did not explain that Mr. Keltner's condition was stable as of August 2016, and the record evidence, if anything, critically undermines this conclusion.   Constructively removing Mr. Keltner from the TDRL on August 31, 2016, was arbitrary and capricious.   Given the government's admittedly prejudicial procedural errors, the government has the burden to demonstrate harmless error — *i.e.*, that Mr. Keltner would have been removed from the TDRL as of August 31, 2016, in any event. *See Skinner v. United States*, 594 F.2d 824, 831 (Ct. Cl. 1979) ("If there is to be such a showing to establish the defense of harmless error on defendant's part, it would more fairly belong to defendant — the party guilty of the mistake in the first place.   This is the rule in civilian pay cases." (citing *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274 (1977))); *Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003) (noting that "[t]his court and its predecessor court have applied the harmless error analysis to military back pay cases" and explaining that the burden to show harmlessness ultimately rests with the government).   Although the Court, as explained *supra*, agrees that the Board may retroactively correct a service member's records, its selection of the August 31, 2016, stabilization date is not supported by the administrative record.

## VI.   RELIEF

Mr. Keltner requests that this Court "direct the Air Force to correct Mr. Keltner's military record to reflect that he was removed from the TDRL on January 22, 2021[,] with a final PTSD disability rating of 50 percent and award military medical retirement benefits."   Pl. MJAR at 26.   In opposition, the government submits that "[e]ven if this

---

[62] The Court suspects that the psychological advisor's reliance on post-August 2016 medical records is precisely why the Second AFBCMR Decision not only avoids discussing the precise basis for the stability finding but also declines to locate any precise date for stabilization even within the psychological advisor's memorandum itself.   *See* Pl. Reply at 13 (correctly noting that "to the extent the Air Force could show that August 31, 2016[,] is the proper removal date, the January 2017 and June 2017 notes are temporally irrelevant").

Court were to agree with Plaintiff that the board erred in awarding him a 10% disability rating, the proper remedy here is remand back to the board." Def. MJAR at 42. According to the government, this Court's ordering anything other than a remand is "inappropriate" because it would be inconsistent with the standard of review. *Id.* at 42–43 (arguing that "Mr. Keltner is in essence asking this Court to sit in place of the board, and act as a 'super-correction' board, reweighing the evidence of his disability determination *de novo*" (quoting *Skinner*, 594 F.2d at 830)).

Mr. Keltner is correct that there is no reason, let alone any requirement, that this Court must remand his case to the Air Force for yet a third bite at the apple. The record is fully developed and supports Mr. Keltner's claim for a disability retirement at a fifty percent rating per the VA Rating Decision, consistent with the August 2016 VA C&P Examination.

In contrast, the government's position improperly glosses over the fact that this case involves a money-mandating claim for compensation pursuant to the Tucker Act, 28 U.S.C. § 1491(a). If this Court were to adopt the government's view, we would never be able to enter a money judgment on a military pay claim; all we could do is issue remand after remand until the agency eventually renders a reasonable decision supported by the administrative record. But the Tucker Act does not require infinite remands. *See, e.g., Furlong v. United States*, 152 F. Supp. 238, 240–41 (Ct. Cl. 1957) ("[O]n a finding of arbitrary or otherwise unlawful action by the retiring board and Secretary, it is our duty to act in the place of the retiring board and, on a finding of disability at the time of discharge, to hold an officer is entitled to retired pay from the date of his discharge."); *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 85 (2022) ("[T]he government cannot forever avoid vacatur or other injunctive relief by seeking infinite remands." (citing cases)).

The Tucker Act's Remand Statute provides further support for Mr. Keltner's position:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters

> to any administrative or executive body or official with such direction as it may deem proper and just.

28 U.S.C. § 1491(a)(2); *see* RCFC 52.2 ("Remand a Case").[63]

    The Federal Circuit's predecessor tribunal, the Court of Claims — the decisions of which remain binding on this Court — has explained that "[t]he objective of the remand power is to provide a complete remedy" and that "[t]he deliberate Congressional purpose in enacting the remand statute was to make it unnecessary for the parties to go to another court, after the Court of Claims made its decision, to obtain the rights which follow from the decision." *Hoopa Valley Tribe v. United States*, 596 F.2d 435, 447 (Ct. Cl. 1979) (first citing S. Rep. No. 92-1066, at 2 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3116, 3117; and then citing H.R. Rep. No. 92-1023, at 3–4 (1972)). Thus, the point of the Remand Statute is to provide this Court with similar powers to those of district courts, so long as the underlying monetary claim is properly within this Court's jurisdiction. *See id.* ("[T]he remand power was available in this court and made it unnecessary for a party . . . to sue in a district court to challenge the [agency's] decision[.]"); *see also United States v. Testan*, 424 U.S. 392, 402 (1976) ("The remand statute . . . applies only to cases already within the court's jurisdiction.").

    Accordingly, this Court may instruct the Air Force (or remand the case to the Air Force): (1) to correct Mr. Keltner's records consistent with this decision; and (2) to calculate how much it owes Mr. Keltner such that he will be paid accordingly. *See, e.g., Fisher*, 402 F.3d at 1175 ("If [plaintiff] were to succeed on his claim that the Secretary's decision was wrong and should be reversed, he would be entitled to disability retirement pay under [10 U.S.C.] § 1201, and whatever procedural remedies were necessary to achieve that result. The Court of Federal Claims is fully empowered to grant such remedies."); *Carman v. United States*, 602 F.2d 946, 948–49 (Ct. Cl. 1979).

    Alternatively, this Court may enter partial judgment for Mr. Keltner and conduct further proceedings, including taking evidence, to decide the quantum of damages. *See Dodson v. U.S. Gov't, Dep't of Army*, 988 F.2d 1199, 1208 (Fed. Cir. 1993) (concluding that plaintiff "is entitled to back pay and allowances" and remanding case "to the district court for a proper determination as to this amount"); *Bray v. United States*, 515 F.2d 1383, 1396–97 (Ct. Cl. 1975) (entering judgment on liability, concluding "as a matter of law that plaintiff is entitled to recover active duty pay and allowances from July 3, 1962, to the end

---

[63] *See also Keltner v. United States*, 148 Fed. Cl. 552, 558 (2020) ("In 1972, Congress first conferred the remand power on the Court of Claims — the Federal Circuit's (and this Court's) predecessor — via '[t]he remand statute, Pub. L. [No.] 92-415, 86 Stat. 652, now codified as part of 28 U.S.C. [§] 1491.'" (quoting *United States v. Testan*, 424 U.S. 392, 404 (1976))).

of his then current enlistment term, March 13, 1964," and instructing that " [t]he amount of recovery is reserved for further proceedings under Rule 131(c)").[64]

Following *Bray,* the Court of Claims in *Cruz Casado v. United States*, ordered what this Court views as a viable remedy in this case:

> In view of the Government's failure to follow its own published regulations, in a manner that substantially and adversely affected plaintiff's rights, the discharge cannot stand. *Since the Correction Board improperly failed to correct the error we will do so.* Plaintiff must be presumed to have continued in the Army during the intervening years, must be paid accordingly, *Bray v. United States, supra,* and again must be placed on the active duty list. . . . It is, therefore, concluded that plaintiff is entitled to recover back pay and allowances as provided by law, less appropriate offsets to be determined in a further proceeding pursuant to Rule 131(c). It is ordered pursuant to 86 Stat. 652, 28 U.S.C. § 1491 (Supp. III, 1973), that the Secretary of the Army reinstate plaintiff and that his records be corrected . . . .

553 F.2d 672, 676 (Ct. Cl. 1977) (emphasis added); *see also Versaci*, 403 F.2d at 262 (holding that where a "40 percent disability finding stands unimpaired," it "properly forms the basis for judgment herein" such that "Plaintiff should have been retired as of such June 30, 1960[,] date with disability pay based upon such 40 percent disability rating" and with the precise "amount due to be determined in further proceedings" (internal quotations and citations omitted)); *Sanders*, 594 F.2d at 13 (ordering the Air Force to reinstate plaintiff to the rank of captain, correcting his records, entering "[j]udgment . . . for plaintiff with the amount thereof to be determined" under the court's rules, *and* remanding "the case . . . to the Secretary of the Air Force with orders to implement" the relief); *Skinner*, 594 F.2d at 831–32 (granting plaintiff's motion for summary judgment, ordering "that plaintiff be restored to active duty commission status as a major," and remanding the case "to the trial division for computation" of damages).

Accordingly, there are several possible avenues of appropriate relief; the parties shall meet and confer to determine whether they can agree on an approach.

---

[64] RCFC 42(c) ("Separate Determinations of Liability and Damages") preserves the substance of prior Rule 131(c).

## VII.    CONCLUSION

The AFBCMR's determination that Mr. Keltner warranted a ten percent disability rating as of August 31, 2016, was arbitrary, capricious, contrary to law, or unsupported by substantial evidence.    Accordingly, Mr. Keltner's MJAR is **GRANTED** and Defendant's MJAR is **DENIED**.

In lieu of entering any judgment at this time, however, the Court orders the parties to meet and confer regarding an appropriate remedy.  In particular, the parties shall file a joint status report, selecting one of the following three approaches:

1. The Court enters final judgment and orders the correction of Mr. Keltner's records consistent with this decision, such that he is entitled to a fifty percent disability rating as of either August 31, 2016 (or as of when he would have been effectively removed from the TDRL after five years), and that the Air Force will pay Mr. Keltner accordingly.

2. The Court remands this matter to the Air Force with instructions to correct Mr. Keltner's records, consistent with this decision, such that he is entitled to a fifty percent disability rating as of either August 31, 2016 (or as of when he would have been effectively removed from the TDRL after five years), and for the Defense Finance and Accounting Service to calculate the sum owed to Mr. Keltner for the purpose of this Court entering final judgment at a later date.  *See Rogers v. United States*, 26 Cl. Ct. 1023, 1025 (1992) (describing the process, pursuant to 28 U.S.C. § 2507, of ordering an agency to calculate damages in a military pay case); *Laningham v. United States*, 30 Fed. Cl. 296, 316 (1994) (same).

3. This Court enters partial judgment, ordering the correction of Mr. Keltner's records consistent with this decision (as detailed *supra*), and holds further proceedings on damages consistent with RCFC 42(c)(1) and 28 U.S.C. § 2507.

If the parties are unable to agree on a remedy, the parties may provide their respective positions in the joint status report, not to exceed five (5) pages per party.  In that case, the parties shall limit their discussion only to their preferred selection of one of the above-described remedies; the parties shall not further address the underlying merits. The joint status report shall be filed on or before **May 29, 2023**.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge